[No. 32353. Department Two. September 21, 1953.]

THE STATE OF WASHINGTON, *Respondent*, v. CLARENCE
SMITH, *Appellant*.[1]

*P. R. McIntosh* and *Wm. S. Lewis*, for appellant.

*Charles O. Carroll* and *Dale E. Sherrow*, for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment
and sentence for the crime of indecent liberties. The infor-
mation charged:

"He, the said CLARENCE SMITH, in the County of King,
State of Washington, on or about the 13th day of July, 1952,
wilfully, unlawfully and feloniously then and there did
take indecent liberties with and on the person of one Sharon
Smith, then and there a female child under the age of fif-
teen years, to-wit: of the age of eight years."

Clarence Smith and his family, consisting of his wife and
three children, were staying at a cabin at Shady Lake, in

[1]Reported in 261 P. (2d) 109.

King county. On Sunday, July 13, 1952, the mother and children were out by the lake. The father was alone in the cabin. The mother sent Sharon, age eight years, up to the cabin. When she returned, she told her mother what her father had done to her. We shall endeavor not to relate the revolting details of what transpired. If true (and the jury so found), there is no doubt but that the father committed the crime of taking indecent liberties.

The mother told her folks, who notified the authorities. On Monday, July 21st, the father, mother, and Sharon were questioned in the office of Leo M. Sowers, juvenile officer of the sheriff's office. Mrs. Ruth deHart, an employee of the juvenile department, was also present. In the presence of her mother, Sharon related to Mrs. deHart the details of the crime. The father also related what had transpired and signed a confession, which went into considerable detail.

Mr. Smith was arrested and charged with taking indecent liberties, and the mother and children went to live with the mother's relatives. Later, Smith was released on bail, and he and his family lived together until the trial. At the conclusion of the trial, the jury found the defendant guilty as charged.

The assignments of error are: that the court erred in denying a new trial on the grounds that there was irregularity in the proceedings of the court and jury; that the court erred in denying a motion that the jury be instructed to disregard the testimony of Sharon Smith; that the court erred in ordering the child to testify that the matters suggested to her by the court's leading questions were the truth; and that the court erred in giving certain instructions.

Appellant signed an affidavit in support of his motion for new trial, alleging that, after submission of the cause to the jury, he was present and waiting in the court room adjoining the jury room; that, after deliberation for some time, sounds of loud argument and discussion emanated from the jury room; that after this continued for some time the bailiff knocked on the door, opened the door, and told the jurors

that they would have to lower their voices; that he then closed the door and there were no more sounds of argument or discussion audible in the court room; that a very few minutes later the jury announced that it had reached a verdict.

Fred A. Landon, the bailiff, in a controverting affidavit, stated that he heard sounds of discussion emanating from the jury room; that he knocked, opened the door, and requested the jurors to lower their voices; that a juror asked if the judge was still in the courthouse; that he replied in the affirmative and stated that the judge would remain until six o'clock, at which time the jury would be taken out to dinner.

Appellant relies upon RCW 4.44.300, derived from the Code of 1881, § 229, which we quote:

"After hearing the charge, the jury may either decide in the jury box or retire for deliberation. If they retire, they must be kept together in a room provided for them, or some other convenient place under the charge of one or more officers, until they agree upon their verdict, or are discharged by the court. The officer shall, to the best of his ability, keep the jury thus separate from other persons, without drink, except water, and without food, except ordered by the court. He must not suffer any communication to be made to them, nor make any himself, unless by order of the court, except to ask them if they have agreed upon their verdict, and he shall not, before the verdict is rendered, communicate to any person the state of their deliberations or the verdict agreed on."

In *State v. Wroth*, 15 Wash. 621, 47 Pac. 106, the jury, during its deliberations, requested to see the judge. He went to the jury room and stood in the doorway, the door being partly opened. He then informed counsel that the jurors requested additional instructions. We held that to be reversible error. In *State v. Waite*, 135 Wash. 667, 238 Pac. 617, the jury sent a note to the judge asking if they could make additional recommendations. He went to the jury room and informed them that they could. We reversed the conviction. In *State v. Burke*, 124 Wash. 632, 215 Pac. 31, we reversed where the bailiff delivered to the jury a mag-

nifying glass which had not been introduced in evidence. In *State v. Moore*, 38 Wn. (2d) 118, 228 P. (2d) 137, we reversed when the bailiff furnished the jury with a magnifying glass and also informed them that a shoe which they wanted to examine (which was not in evidence) had been taken back to Bremerton and was not available.

In *State v. Aker*, 54 Wash. 342, 103 Pac. 420, after the jury had retired to deliberate upon its verdict, the bailiff unlocked the door to the jury room, placed his person within the jury room so that only one of his legs remained without the door, and was heard speaking to the jurors. In affirming the judgment and sentence we said:

"It is not claimed that the bailiff said anything to the jurors relating to the case. The affidavit is silent as to what the bailiff said to the jurors, and is also silent as to whether or not the affiant understood what the bailiff said to the jurors. We are not inclined to sanction any practice which permits the invasion of the privacy of the jury room during deliberation. But we cannot presume that a sworn officer of the court whose duty it is to have charge of the jury has been guilty of misconduct when such alleged misconduct occurred in the presence of the person making affidavit relative thereto, and no more is shown as to such conduct than is stated in this affidavit. We cannot presume that the bailiff stated anything to the jury in connection with the cause when affiant states that he heard him speak to the jury, but does not state what he said or as to whether or not affiant knew what he said. We do not think that the mere temporary presence of the bailiff in the jury room door under the circumstances here shown is such misconduct as warrants us in holding that the trial court committed error in refusing a new trial on that account."

In *State v. Carroll*, 119 Wash. 623, 206 Pac. 563, while the jury was deliberating, the wife of one of the jurors handed the bailiff a note to be delivered to her husband, which the bailiff delivered, and which read: "Am going to get a bite to eat downtown and then go to a movie. M." The affidavits of both the husband and wife stated that the note had no secret meaning. A new trial was asked for, and it was contended that the above statute had been violated, to the defendant's prejudice. We said:

"While it is plain the bailiff violated the statute, it does not necessarily follow that there was a mistrial. There is absolutely nothing to show that the appellant was prejudiced because of the note which was given to the juror. In fact, it affirmatively appears that there was not, and could not have been, any prejudice. Under such circumstances, we will not disturb the order of the court in refusing to grant a new trial. *State v. Smokalem,* 37 Wash. 91, 79 Pac. 603; *State v. Aker,* 54 Wash. 342, 103 Pac. 420, 18 Ann. Cas. 972; *State v. Pepoon,* 62 Wash. 635, 114 Pac. 449; *State v. White,* 113 Wash. 416, 194 Pac. 390.

"While we refuse on this ground to grant a new trial, we wish to say that the bailiff was guilty of misconduct, and his action is certainly to be condemned. Such thoughtless acts by those in charge of jurors are dangerous and very often lead to errors which must force a new trial."

In the case at bar, although there was a technical violation of the statute, the bailiff should not be censored. The appellant was sitting in the court room. Loud sounds emanated from the jury room. Apparently the bailiff was fearful that the deliberations might become common knowledge. He was in charge of the jury. Surely, in a situation of that kind the bailiff should not be required to report to and obtain permission from the judge before acting. We find no prejudice to appellant because of the bailiff's action.

We shall consider together the assignments that the court erred in denying a motion to disregard the testimony of Sharon Smith and also erred in ordering her to testify that the matters suggested to her by the court's leading questions were the truth. During the direct examination of Sharon the following occurred:

"Q. Now, after the 4th of July, do you remember the day that your mother sent up to the house for a towel? A. Yes. Q. Did you go up to the house for a towel? A. Yes. Q. Was anybody in the house when you got there? A. Yes. Q. That was out where? Was it at Shady Lake? A. Yes. Q. Who was in the house? A. Daddy. Q. Who else, if anyone besides your dad, was in the house? A. Nobody. Q. Nobody else? A. No. Q. When you got in the house did your dad say anything to you? A. No. Q. Excuse me? A. No. Q. What, if anything, did your dad do when you got in the house, Sharon? A. I can't remember. Q. Sharon, are you

telling me the truth? A. Yes. Q. Do you remember the conversation we had Saturday? A. Yes. Q. Did you tell me what happened in the house that day? A. Yes. Q. Did you tell me you were going to tell the truth here today? A. Yes. THE COURT: Just go ahead and tell what happened when you got in the house. BY MR. SHERROW: Q. You are not afraid today, are you? A. Yes. THE COURT: Just look up at me. What are you afraid of? THE WITNESS: Everything. THE COURT: Has anyone talked to you lately? THE WITNESS: Yes. THE COURT: Who? THE WITNESS: Mommy. THE COURT: Who else? A. Mr. Sowers. THE COURT: Who else? THE WITNESS: And he (indicating). THE COURT: Mr. Sherrow here? THE WITNESS: Yes; and Mr. McIntosh. THE COURT: You mean that gentleman seated down there (indicating)? THE WITNESS: Yes. THE COURT: When did he talk to you? THE WITNESS: Monday. THE COURT: Of last week? THE WITNESS: Yesterday."

After the cross-examination, the court excused the jury and the following occurred:

"BY THE COURT: Q. I want to know why it is that you don't want to tell us exactly what happened. You said you were afraid of those men and women seated there. A. I was. Q. Why were you afraid of them? A. Because. Q. Why? A. Because I don't know. Q. Well now, has any one told you not to tell the truth here? A. Yes. Q. Who was it that told you not to tell the truth? A. My mother. Q. When was it that she talked to you last? You speak up frankly with me because these men in the jury are gone. When did your mother tell you? A. About a month ago. Q. Did you talk to her this morning in the hallway? A. Yes. Q. What did she tell you then? A. Mr. Sowers was out there. Q. She didn't say anything to you then? A. No. Q. How long since you have seen your mother? A. Yesterday. Q. Did she talk to you yesterday? A. Yes. Q. What did she say to you? A. Not very much because Mr. Sowers was there. Q. When did you see your mother last with nobody present when you spoke to her? A. Saturday. Q. What did she say to you then? A. Nothing about it. Q. Has she talked to you about the case since a month ago when she told you not to tell the truth? A. Yes. Q. How many times? A. Once. Q. About when was that? A. It was on a wash day. Q. How many days ago? A. About fourteen. Q. Where was that? A. At our own house on the farm. Q. Now, why did your mother ask you not to tell the truth? A. I don't know. Q. What did

she say to you about it? A. She said,—no, it was not fourteen days ago. Q. How long ago? A. Friday night. Q. Where was that? A. At my Uncle Bert's. Q. What did she say to you? A. She said, 'You tell these people that it never happened, and when it happened. mommy was pregnant,' and mommy said, 'you know because she was not feeling very well that day.' I agreed with her. Q. You agreed with her? A. That I didn't do it. Q. You mean, that this didn't happen that you had told about before? A. Yes. Q. What had you told your mommy before as to what happened? A. I told her just what I told you guys."

The court then questioned her, in detail, in the absence of the jury, as to the transaction which occurred at the lake on the day in question. The court then asked:

"Now, when these men and women who are seated over there come in at one-thirty, will you tell them the truth as you have told me?"

The jury was then returned, and Sharon was further questioned and cross-examined. It developed during the examination that a day or two before the trial, Mr. Sherrow, deputy prosecutor, talked to Sharon at the juvenile home. Her memory was about as good as it was at the beginning of her testimony which has been quoted above. Mr. Sherrow went out of the room temporarily and left some papers on a table. There is no claim of misconduct on the part of the deputy prosecutor. During his absence, Sharon read part of the top paper, and upon his return she related the facts to him substantially as she testified. It is contended that her testimony was governed by what she read and not by what actually occurred. During cross-examination, she testified:

"Q. Do you know that happened because the paper said so? A. It happened to me; that is why I know after I read the paper. Q. But you didn't know until you had read the paper? A. I had forgotten."

We find no misconduct on the part of the trial judge. Here was an eight-year-old girl on the witness stand. Because of his experience on the bench, the judge appreciated the seriousness and the danger of permitting a girl of tender years to testify concerning such atrocious conduct on

the part of her own father. After a rather exhaustive questioning, he felt convinced that this was not a "trumped-up" story or a figment of Sharon's imagination, but that she was truthfully telling what actually happened. Our examination of the record convinces us that she told the truth. On the day in question, she told her mother; the mother told her folks, who complained to the officers. Eight days later, in her mother's presence, she told Mrs. deHart, and the same day the father signed a confession. The details of Sharon's story to Mrs. deHart, and of the father's confession on July 21st, were practically the same as her testimony at the trial.

We find no error in giving the instructions complained of. They correctly stated the law and were properly presented to the jury.

The judgment and sentence is affirmed.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.