[No. 33107-1-II.   Division Two.   June 27, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. SCOTT M. YONKER, *Appellant*.

*Sheri L. Arnold*, for appellant.

*Gerald A. Horne, Prosecuting Attorney, Michelle Hyer, Deputy,* and *Donna Y. Masumoto, Legal Intern*, for respondent.

¶1 PENOYAR, J. — Scott Yonker appeals his conviction for attempting to elude a pursuing police vehicle. Yonker claims error at trial because (1) the judicial assistant took the jury to lunch just before it returned a verdict, (2) the trial court instructed the jury to continue deliberating even though the jury said it was deadlocked, (3) the trial court changed the jury instructions after two days of deliberation, and (4) the evidence was not sufficient to support the verdict. We affirm.

## FACTS

### I. BACKGROUND

¶2 On November 22, 2004, at approximately 7:00 PM, Pierce County Sheriff's Deputy Mark Gosling was on patrol in uniform and driving his marked police car. He was driving westbound on SR 702 when he passed a black Mercury Tracer traveling in the opposite direction. Gosling turned around, pulled up behind the Mercury, and activated his overhead lights and siren.[1]

¶3 The Mercury slowed like it was going to stop and Gosling got within 15 to 20 feet. Gosling's spotlight lit the car's interior. He could see there was only one person in the car, a white male with short hair. The car then accelerated away very quickly.

¶4 Gosling pursued the Mercury, which was going at least 90 miles per hour in a 55 miles-per-hour zone. It ran a stop sign at 70 to 80 miles per hour and sped through a busy intersection. Knowing Deputy Pete Turner had set up stop sticks[2] a short distance ahead, Gosling slowed down but kept the Mercury in sight. It continued to travel at high speeds along a two lane road, passing other cars on curves and forcing oncoming traffic to the side of the road. The

---

[1] The State and defense stipulated that the deputy had a legal justification to attempt to stop the vehicle.

[2] Stop sticks are triangle-shaped devices designed to puncture the tires of a car that drives over them.

Mercury hit the stop sticks, then continued traveling. The deputies briefly lost sight of the vehicle.

¶5 A few minutes later, the deputies located the driverless vehicle about a half mile from the stop sticks in the woods about 30 to 40 feet from the road. Turner arrived first and heard someone running northbound through the woods. Other deputies arrived and surrounded the wooded area where they believed the suspect was located. The woods were thick with very dense undergrowth. There were no houses or businesses in the area, no pedestrians, and light vehicle traffic.

¶6 About 5 to 10 minutes later, Deputy John Munson arrived with a K-9 tracking dog named Fox and they began tracking from the vehicle. Fox went about 40 to 50 yards north of the car and found Yonker hiding beneath a pile of brush.

II. Procedural History

¶7 The State charged Yonker with possession of the stolen Mercury Tracer and attempting to elude a pursuing police vehicle. The State dropped the stolen property charge before trial.

¶8 Trial testimony lasted only a few hours, with the three deputies as the only witnesses. In closing, Yonker argued that the State had no direct evidence against him because no one saw him driving the car and, therefore, the State had not proved its case beyond a reasonable doubt.

¶9 After the parties gave their closing arguments but before the jury began deliberating, the court added a jury instruction defining intent. Neither party objected.

¶10 The court's initial instructions to the jury also explained that the defendant is presumed innocent and that the State has the burden of proving each element of the crime beyond a reasonable doubt. The time-honored reasonable doubt instruction went on to say:

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as

would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Clerk's Papers (CP) at 51, Instruction (Instr.) 2. This instruction was taken from 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01 (2d ed. 1994) (WPIC). The court also gave the standard instruction on circumstantial evidence.[3]

¶11 According to the court's memorandum of journal entry, the jury began deliberations at 11:00 AM on February 16, took a lunch break between 11:50 AM and 1:00 PM, and then at 1:50 PM requested more copies of the instructions and asked a question. The question was, "Are we required to use circumstantial evidence?" 3 Report of Proceedings (RP) at 141; CP at 28. After conferring with both counsel in the defendant's presence, the court answered about an hour later, "You have the court's instructions with regard to the law. Please refer to those instructions." 3 RP at 142.

¶12 About an hour after this first response, the jury asked, "What happens if we are unable to reach a unanimous decision?" 3 RP at 143; CP at 26. The court determined that the jurors had not yet sufficiently deliberated. The court released them for the day and instructed them to return the following day.

¶13 The jury returned the next day and began deliberating at 9:00 AM, breaking for about an hour lunch. At about 3:00 PM, the jury sent a note saying, "We can't come up with a unanimous verdict. We are going around and around." 4 RP at 150; CP at 33. The court asked the

---

[3] This instruction stated:

Evidence may be either direct or circumstantial. Direct evidence is that given by a witness who testifies concerning facts that he or she has directly observed or perceived through the senses. Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. One is not necessarily more or less valuable than the other.

CP at 40, Instr. 3.

presiding juror whether there was a reasonable probability of the jury's reaching an agreement within a reasonable time and, with hesitation, the presiding juror said no. The court then polled the rest of the jury, asking each juror the same question, and each said no.

¶14 After the jury returned to the jury room to await further instructions, the court suggested letting the jurors go for the day and having them come back fresh the next morning to continue deliberating. Both counsel agreed. The court speculated that if the jury could not return a verdict by noon the following day, they would be truly deadlocked.

¶15 The next morning, defense counsel brought a motion to declare a mistrial. In denying the motion, the court said, "[T]here was quite a bit of hesitation by the presiding juror as to whether they really were unable to reach a decision." 5 RP at 163.

¶16 After about two hours of deliberation, the jury sent another question. It said, "We are having conflicting interpretations between a portion of Instruction No. 2 and Instruction No. 7 . . . .We are asking for further interpretation as to how these two portions do not conflict with each other." 5 RP at 164-65; CP at 53.

¶17 The jury provided a copy of instruction 2, the "reasonable doubt" instruction, and underlined the sentence saying, "If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." CP at 54; 5 RP at 164. The jury also provided a copy of instruction 7, the "to convict" instruction giving the elements of attempting to elude. It underlined the last sentence of this instruction, which says, "On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty." CP at 55; 5 RP at 164.

¶18 After conferring with counsel, the trial court decided to withdraw instruction 2 and provide the jury with a

more recent version of the reasonable doubt instruction, taken from WPIC 4.01A. The new instruction said in part:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

CP at 39, Instr. 2A; 5 RP at 172. Yonker objected to changing the instruction.

¶19 After reading the new instruction to the jury, the court recessed the jury for lunch with instructions to reconvene at 1:30 PM The memorandum of journal entry reads: "12:06 PM Jury is excused for lunch. 12:07 PM Court is at recess. Judicial Assistant takes the jury to lunch. 01:13 PM Jury returns and resumes their deliberations. 01:20 PM Jury advises the judicial assistant that they have a verdict." CP at 91. The jury convicted Yonker of attempting to elude.

## ANALYSIS

### JUDICIAL ASSISTANT TAKING THE JURY TO LUNCH

¶20 Yonker asks us to infer that, because the jury returned a verdict so soon after the judicial assistant[4] took the jury to lunch, the jury "became unanimous during lunch." Appellant's Br. (App. Br.) at 26-27. He claims that "[w]hether discussions of the verdict actually occurred at lunch matters not, because the appearance of impropriety was so great." App. Br. at 27. Furthermore, he alleges this lunch was never disclosed to the parties. He asks for reversal because of the "distinct possibility that the im-

---

[4] In Pierce County Superior Court, the judicial assistant has the duties of a bailiff.

proper communications between the judicial assistant and the jurors prejudiced the jury." App. Br. at 27.

¶21 The State argues that Yonker has failed to meet his initial burden of showing any improper communication occurred. It points out that the record shows no improper communications between the judicial assistant and the jury.

¶22 Yonker brings this claim for the first time on appeal. Yonker may raise this issue for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). If the record from the trial court is not sufficient to determine the merits of the constitutional claim, then the claimed error is not manifest and appellate review is not warranted. *State v. WWJ Corp.*, 138 Wn.2d 595, 602, 980 P.2d 1257 (1999).

¶23 An improper communication between the court and the jury is an error of constitutional dimensions. *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997). However, because Yonker does not provide any evidence as to what the improper communication may have been, we cannot say whether the error in this case was manifest.

¶24 We reject Yonker's claim on appeal because he has failed to establish the fact of an improper communication capable of causing prejudice. *See Bourgeois*, 133 Wn.2d at 407. We will not simply presume the judicial assistant acted improperly. *State v. Rose*, 43 Wn.2d 553, 556, 262 P.2d 194 (1953) (declining to presume that a sworn officer of the court, whose duty it was to have charge of the jury, had been guilty of misconduct).

¶25 As a general rule, a trial court should not communicate with the jury in the defendant's absence. *Bourgeois*, 133 Wn.2d at 407 (citing *State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983)); *see* RCW 4.44.300.[5]

---

[5] During deliberations, the jury may be allowed to separate unless good cause is shown, on the record, for sequestration of the jury. Unless the members of a deliberating jury are allowed to separate, they must be kept together in a room

The bailiff is in a sense the judge's "alter-ego" and is therefore bound by the same constraints as the judge. *Bourgeois*, 133 Wn.2d at 407; *State v. Johnson*, 125 Wn. App. 443, 461, 105 P.3d 85 (2005).

¶26 A bailiff, as an officer of the court and the judge's representative, is generally forbidden to communicate with the jury during its deliberations, except to inquire if the jury has reached a verdict. RCW 4.44.300; *Johnson*, 125 Wn. App. at 460. However, this does not preclude innocuous or neutral statements. *State v. Smith*, 43 Wn.2d 307, 311, 261 P.2d 109 (1953) (finding no prejudice when the bailiff asked the jurors to lower their voices so they would not be overheard); *State v. Forsyth*, 13 Wn. App. 133, 137, 533 P.2d 847 (1975) (bailiff was only expressing concern for the young molestation victim and was not commenting on her credibility).

¶27 The record of proceedings in this case shows only that the jury took a break for lunch immediately after the court read it the revised reasonable doubt definition. The only record showing that the judicial assistant took the jury to lunch is the notation in the memorandum of journal entry. We have no information as to what the judicial assistant may have said, whether she physically sat at the same table with the jurors, or whether she only took their lunch orders. Yonker does not provide any affidavits or other information to explain the circumstances. Instead, he asks us to infer impropriety because the jury returned a guilty verdict so quickly after lunch. We hold that this is insufficient for a prima facie showing that the judicial assistant improperly communicated with the jury.

---

provided for them, or some other convenient place under the charge of one or more officers, until they agree upon their verdict, or are discharged by the court. The officer shall, to the best of his or her ability, keep the jury separate from other persons. *The officer shall not allow any communication to be made to them, nor make any himself or herself, unless by order of the court,* except to ask them if they have agreed upon their verdict, and the officer shall not, before the verdict is rendered, communicate to any person the state of their deliberations or the verdict agreed on.

RCW 4.44.300 (emphasis added).

¶28 Many of a bailiff's legitimate functions involve perfunctory communication with the jury, from taking their meal orders to telling them where the restroom is located. Thus, it is too broad a statement to say that all communications from a bailiff to a jury are forbidden. *See Smith*, 43 Wn.2d at 311. The law forbids only communications that could possibly influence deliberations. *E.g., State v. Booth*, 36 Wn. App. 66, 69-70, 671 P.2d 1218 (1983) (reversing conviction where bailiff's statements to the jury undermined the defendant's arguments at trial). Communications necessary for the proper care of the jury, such as lunch orders and other administrative matters, do not raise an inference of impropriety because these communications are neutral and innocuous.[6] *See Johnson*, 125 Wn. App. at 460; *Forsyth*, 13 Wn. App. at 137.

¶29 Affirmed and published in part.

¶30 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and HUNT, JJ., concur.

---

[6] We also note that, although this is no longer the practice, historically the bailiff was required to accompany the jury to meals to ensure that no improper separation or outside contact took place. *E.g., State v. Creech*, 57 Wn.2d 589, 593-94, 358 P.2d 805 (1961); *Rose*, 43 Wn.2d at 555-56.