# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON , Respondent , v. FABIAN MARCEL BROWN, Appellant. | No. 78524-9-I DIVISION ONE UNPUBLISHED OPINION FILED: September 23, 2019 |

APPELWICK, C.J. — Brown appeals his conviction for residential burglary. He contends that he was deprived of a fair trial because: the prosecutor committed misconduct during closing argument, defense counsel failed to object to the prosecutor's misconduct, and the court's bailiff improperly communicated with the jury during deliberations. We affirm Brown's conviction, but remand for the trial court to strike the DNA collection fee.

## FACTS

In the early morning hours of July 11, 2017, Laurel Evans and Michael Smith were asleep in an upstairs bedroom of their home. Evans woke up when a man opened the door to the bedroom and entered the room. Evans woke Smith and then got out of the bed. The intruder turned and ran and Evans ran after him down the short flight of stairs to the main floor. She did not catch up with him and did not see him after that. Neither Evans nor Smith got a clear look at the intruder's face. Evans saw a tall man in silhouette, who had a goatee and was carrying a

plastic grocery bag. Smith saw a tall man wearing an oversized gray hoodie. Smith followed Evans down to the main floor. The door into their kitchen from outside was open, the light was on, and the door window was broken. There was a brick on the floor among the broken glass. Smith called 911.

After the police arrived, Evans discovered that boxes in a guest bedroom had been tossed and jumbled. She and Smith noted that there were items missing, including a couple of cell phones, a global positioning system unit, and some other electronics. One of the officers lifted fingerprints from the deadbolt on the kitchen door. When analyzed later, the prints were determined to be of no value.

Police officers established a containment perimeter, and deployed a K-9 team to search for the suspect. The K-9 team, led by Officer Christopher Hairston, began tracking from the side door of Smith and Evans' home. The tracking dog attempted to proceed south, but was initially blocked by a fence. After Officer Hairston took the dog around the house to avoid the fence, the dog tracked east toward an intersection briefly and lost the scent. The team returned to a staircase near the house and began the track again. This time, the dog followed the scent south down an alley towards the next block.

An officer at the house with Smith and Evans testified that about 20-25 minutes after being dispatched, he received notice that a homeowner about two blocks away had reported an unknown male on his porch "right now." Andrew Deceunynck was returning from work to his home, which is two blocks south of Smith and Evans' home. As he approached his house, he saw five or six police cars canvassing the area near his house. He arrived at his home at 3:18 a.m. and

2

went upstairs to his bedroom. Within two or three minutes, he heard one of his cats yowling on the main floor, so he went downstairs to see what was going on. His cat went toward the front door where there is a large window overlooking the front steps, and when Deceunynck approached and looked out the window, he saw a man walking up the stairs toward his front door. When the man got to within two or three steps from his front door, Deceunynck began yelling at him to "leave right now." After Deceunynck yelled at the man about three times, the man started to back down his stairs. Deceunynck then called 911.

The police officers already in the area were notified of Deceunynck's call and told that a person matching the description they had from Smith and Evans had been seen at Deceunynck's house, and had left traveling east. Some of the officers involved in containment then drove toward Deceunynck's address. The K-9 team received the same information while the dog was leading them south in the direction of Deceunynck's house, and as the team left the alley and approached the nearest intersection, Officer Hairston saw a man matching the description of the intruder emerging from behind some trees. At essentially the same time, two officers responding in a patrol car saw the man and stopped and detained him. The man did not have a plastic bag in his possession.

The K-9 team approached the suspect, and the dog then continued tracking, this time following the scent in the direction the suspect had been coming from before he was stopped and detained. The K-9 team located a white plastic bag in some bushes near a driveway, not far from where the suspect was stopped. It

contained the electronic devices that had been stolen from the home of Smith and Evans.

Officers drove Smith and Evans to the area where they had stopped and detained the suspect. Evans thought the man was probably the intruder she had seen. Smith was very sure the man was the intruder he had seen earlier.

While he was detained on the street, Brown told one officer that he had come from a friend's house, but he could not provide an address or street name for his friend. The only landmark he could say was near his friend's house was a Shell station, which was four blocks north of where Brown was detained. He told another officer he was waiting for a friend to pick him up.

On July 13, 2017, Brown was charged with committing residential burglary in violation of RCW 9A.52.025. The State alleged as an aggravating factor that the victim of the burglary was present in the building or residence when the crime was committed. RCW 9.94A.535(3)(u). Following a three day trial, the jury convicted Brown as charged. He was sentenced on May 11, 2018 to a standard range sentence of nine months. Brown appeals.

ANALYSIS

I.   Prosecutorial Misconduct

Brown contends that the prosecutor committed misconduct by misstating the reasonable doubt standard during her rebuttal closing argument. Specifically, the prosecutor said it is

> not the State's burden to eliminate all the other possibilities because remember this is beyond a reasonable doubt, not beyond all reasonable doubt. That's the standard. That's the law of the land.

4

> And there are juries all over the country that that's the standard is beyond a reasonable doubt in criminal courts around the country.

(Emphasis added.) Defense counsel did not object to the prosecutor's statement.

The State must prove every element of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). See also, 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 93 (4th ed. 2016) (Washington's pattern "reasonable doubt" instruction). The State does not dispute that the prosecutor's statement conflicts with the law. The issue is whether the statement constitutes prejudicial misconduct requiring remand for a new trial.

Because Brown failed to object to the prosecutor's misstatement at trial, our review is limited to determining whether the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Sakellis, 164 Wn. App. 170, 184, 269 P.3d 1029 (2011) (quoting State v. Gregory, 164 Wn. App. 170, 183, 269 P.3d 1029 (2006)) (holding that the State's argument that the jury must articulate a reason for acquitting by filling in a blank with that reason is improper, but the defendant could not demonstrate an enduring and resulting prejudice). This standard requires Brown to establish that (a) the misconduct resulted in prejudice that "'had a substantial likelihood of affecting the jury verdict,'" and (b) a curative instruction would not have obviated the prejudicial effect on the jury. Sakellis, 164 Wn. App. at 184 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)); see also State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994) (explaining that to show "an enduring and

resulting prejudice," the defendant must establish a "substantial likelihood that the alleged prosecutorial misconduct affected the verdict").

Brown contends that the prosecutor's misstatement of the reasonable doubt standard was so flagrant and ill intentioned that no curative instruction could have overcome the prejudice. He argues that the prosecutor's statement improperly shifted the burden of proof to the defense. Brown relies heavily on cases holding that it is improper for a prosecutor to argue to the jury that to find a defendant not guilty, jurors must be able to say, "I don't believe the defendant is guilty because," and then fill in the blank with the reason. E.g., State v. Anderson, 153 Wn. App 417, 424, 220 P.3d 1273 (2009); State v. Emery, 174 Wn.2d 741, 750-51, 278 P.3d 653 (2012); State v. Johnson, 158 Wn. App. 677, 682, 243 P.2d 936 (2010).

The argument that the jury must be able to articulate its reasonable doubt by "filling in the blank" has consistently been held to be improper. See, e.g., Sakellis, 164 Wn. App. at 185 (citing Johnson, Anderson, and State v. Venegas, 155 Wn. App. 507, 228 P.3d at 813 (2010)). As the court in Anderson, explained,

> By implying that the jury had to find a reason in order to find Anderson not guilty, the prosecutor made it seem as though the jury had to find Anderson guilty unless it could come up with a reason not to. Because we begin with a presumption of innocence, this implication that the jury had an initial affirmative duty to convict was improper. Furthermore, this argument implied that Anderson was responsible for supplying such a reason to the jury in order to avoid conviction.

Anderson, 153 Wn. App. at 431 (emphasis in original).

Brown's reliance on these cases is misplaced. The State did not make a fill-in-the-blank argument here. And, Anderson, Johnson, and Emery all involved additional statements by the prosecutor, beyond the fill-in-the-blank argument, that

6

tended to undermine the reasonable doubt standard or to shift the burden of proof. E.g., Anderson, 153 Wn. App. at 431-32 (prosecutor's argument also compared the reasonable doubt standard to the process by which jurors make such everyday decisions as choosing to leave children with a babysitter or to change lanes on the highway); Johnson, 158 Wn. App. at 682 (prosecutor also analogized reasonable doubt to assembling just half of a puzzle and determining with assurance what the image depicted); Emery, 174 Wn. App. at 750-51 (prosecutor also argued that the jury should "speak the truth" with its verdict, suggesting that the jury's role was to determine the truth of what happened in the case, as opposed to determining whether the State had proved the offenses beyond a reasonable doubt). The question is not whether an improper statement was made, it is whether Brown was prejudiced.

The Supreme Court's decision in Emery clarifies the appropriate focus in cases where the defendant failed to object to a prosecutor's improper argument. 174 Wn.2d at 760-61. "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762.

Brown cannot establish that the prosecutor's misstatement of the reasonable doubt standard was so flagrant and ill intentioned that it could not have been cured by an appropriate instruction from the court. Here, unlike the cases cited by Brown, the prosecutor did not make multiple arguments that misstated or trivialized the reasonable doubt standard. The record shows the opposite, that the

prosecutor properly framed the reasonable doubt standard in her argument several times. In her main closing argument, the prosecutor stated,

> Now we talked about reasonable doubt and that reasonable doubt is in your jury instructions. And the law recognizes that you aren't -- you weren't there at the scene to observe everything. If you were, you wouldn't be sitting in the jury box. You'd be sitting in the witness box. So the law doesn't require beyond all doubt. It's beyond a reasonable doubt.

After the defense closing, the prosecutor argued in rebuttal that "[w]hen we talk about reasonable doubt, your jury instructions are as clear as possible I think on reasonable doubt." The prosecutor then referred to reasonable doubt in the context of a lack of evidence:

> Your jury instructions talk about . . . [i]t is number 3, "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence."
>
> So lack of evidence is a real thing in criminal trials. It can be a real thing and a real reason to acquit someone. But I want you to look at the paragraph before. "A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt."

After the prosecutor misstated the reasonable doubt standard, she made two further references to reasonable doubt, but did not misstate the standard.

The prosecutor's one misstatement of the reasonable doubt standard simply does not compare to the multiple improper forms of argument analyzed in Anderson and Johnson. The jury was instructed correctly on reasonable doubt by the trial judge prior to jury selection and after all evidence was presented. The jury received the court's instructions in writing. We review the prosecutor's improper comment in the context of the total argument, the issues in the case, the evidence,

8

and the jury instructions. Feely, 192 Wn. App. at 763-64. Brown has not established that any prejudice from the improper statement could not have been readily cured by a cautionary instruction had Brown objected. Cf. id. at 763-65 (holding defendant, who did not object to prosecutor's argument that the jury should convict if it "knew" the defendant was guilty, could not show prejudice, in part because the prosecutor also stated the reasonable doubt standard correctly, the court had instructed the jury, and juries are presumed to follow the court's instructions.)

## II. Ineffective Assistance of Counsel

Brown contends that if his prosecutorial misconduct claim fails for lack of an objection, then he was denied effective assistance of counsel. A defendant claiming ineffective assistance of counsel must show that counsel's performance was objectively deficient and resulted in prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that counsel's performance was effective. Id. at 335. Lawyers do not commonly object during closing argument absent egregious misstatements. In re Pers. Restraint of Davis, 152 Wn.2d 647, 717, 101 P.3d 1 (2004). To show prejudice, the defendant must prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. State v. Leavitt, 111 Wn.2d 66, 72, 758 P.2d 982 (1988). If either element of the test is not satisfied, the inquiry ends. Strickland v. Washington, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

9

We reject Brown's claims that counsel's performance resulted in prejudice. Brown cannot show that, but for counsel's failure to object to the prosecutor's misstatement, the outcome of the trial would have been different. As noted above, the jury was instructed in the proper reasonable doubt standard many times by the trial court and the attorneys. The jury was also told that the law was in the court's instructions, and that they must disregard any remarks, statement, or argument that was not supported by the evidence or the judge's instructions. We presume the jury follows the trial court's instructions. State v. Hopson, 113 Wn.2d 273, 287, 778 P.2d 1014 (1989). Although the prosecutor's statement was improper, in the context of the entire proceedings and the court's instructions, there is no reasonable basis to conclude the result would have been different had defense counsel objected.

III.    Improper Communication with the Jury

Brown contends he was denied a fair trial because the court bailiff improperly communicated with the jury.

On the last day of the trial, following closing arguments, the jury retired to begin deliberations. The court reconvened the following day at 1:43 p.m., and informed the parties that it had received two questions from the jury. The court explained to the parties what had transpired earlier in the day:

> So the first thing that happened is the jury got my bailiff's attention and verbally asked her if they could use a Google Maps app[lication] on one of their electronic devices, and she said absolutely not. And then she came back and told me that she had had that exchange and I clarified that although I completely agreed with her answer, it needed to be in writing so that the answer could

come from me. So at that point, she directed them to put their question in writing.

The jury put the question in writing at 10:56 a.m.: "Can we use our electronics to pull up the Google Map used for our deliberations?"

The court then discussed the jury's question with the parties, noting first that "I mean, the answer is 'no.'" The court asked the parties whether they preferred to give the jury the one word answer "no," or to give them a longer answer communicating the same message. Defense counsel replied that the defense "would be satisfied with a simple 'no,'" although he preferred, generally, to simply refer the jury back to the instructions. The court noted that the jurors had been instructed on the first day of trial that they were allowed to use their electronic devices only when the court was in recess, not in the courtroom and not while deliberating. This instruction was not, however, included in the court's final written instructions to the jury. The prosecutor also agreed with answering the question "no." The court wrote the answer and signed and dated it at 1:46 p.m.

In general, a trial court should not communicate with the jury in the absence of the defendant. State v. Caliguri, 99 Wn.2d 501, 508, 664 P.2d 466 (1983). The bailiff is in a sense the "'alter-ego'" of the judge, and is therefore bound by the same constraints. State v. Bourgeois, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997) (quoting O'Brien v. City of Seattle, 52 Wn.2d 543, 547-48, 327 P.2d 433 (1958)). RCW 4.44.300 specifically provides that the court bailiff

> shall not allow any communication to be made to [the jury], nor make any himself or herself, unless by order of the court, except to ask them if they have agreed upon their verdict, and the officer shall not, before the verdict is rendered, communicate to any person the state of their deliberations or the verdict agreed on.

11

We have held that a bailiff is forbidden to communicate with the jury during deliberations except to inquire if it has reached a verdict, or to make innocuous or neutral statements. State v. Booth, 36 Wn. App. 66, 68, 671 P.2d 1218 (1983). When an ex parte communication takes place, the trial judge should disclose the communication to all parties. Bourgeois, 133 Wn.2d at 407. The purpose of the statute is to insulate the jury from out-of-court communications that may prejudice its verdict. State v. Christensen, 17 Wn. App. 922, 924, 567 P.2d 654 (1977).

Even though an improper communication between the bailiff and the jury is an error of constitutional dimensions, the communication may be so inconsequential as to constitute harmless error. Bourgeois, 133 Wn.2d at 407. Once a defendant raises the possibility an improper communication between the court and the jury has caused prejudice, the State bears the burden of showing that the error was harmless beyond a reasonable doubt. Id.

CrR 6.15(f)(1) provides that the jury shall be instructed that any question it wishes to ask the court about the instructions or evidence should be signed, dated and submitted in writing to the bailiff. The court must then notify the parties of the contents of the question and provide them an opportunity to comment on an appropriate response. Id.

Brown argues that the court failed to (a) immediately notify the parties of the jury's question, (b) provide the parties an opportunity to respond or object before any answer was given to the jury, and (c) answer the jury's question only in writing or in open court on the record, as required by CrR 6.15(f)(1). We disagree with Brown that the court's procedure here deprived him of a fair trial.

The bailiff's response to the jury's question was a simple negative, entirely consistent with the court's oral instructions to the jury, and the bailiff reported the communication to the judge directly after it occurred. The jury put the question in writing at 10:56 a.m. and reconvened at 1:43 p.m. The court's notification to counsel possibly could have been more prompt, but it was not untimely. Cf. Bourgeois, 133 Wn.2d at 398, 408 (where court failed to notify parties that, during trial, there was contact between a juror and the bailiff until a hearing on the defendant's motion for a new trial, notification was untimely). The court here appropriately engaged with counsel to decide how to respond to the jury in writing. Defense counsel participated in this process, agreed with the court's proposed written instruction, and did not object to the bailiff's communication. Under these circumstances, the defendant was not prejudiced, and the error was harmless. Cf. State v. Russel, 25 Wn. App. 933, 948, 611 P.2d 1320 (1980) (citing State v. Safford, 24 Wn. App. 783, 794, 604 P.2d 980 (1979) (holding there was no prejudice to the defendant where judge responded to jury's written request for a legal definition of assault with a note saying "read the instructions," without consulting with the parties)).

Brown further argues that the error was prejudicial because there is no way of knowing exactly what was said by the jurors, or exactly how the bailiff responded. In essence, Brown asks the court to presume that the bailiff engaged in a discussion with the jurors that influenced their deliberations or was otherwise prejudicial. We decline to make such a presumption. See State v. Smith, 43 Wn.2d 307, 310, 261 P.2d 109 (1953) (holding that the court cannot presume a

13

sworn officer of the court has engaged in improper communication with the jury); State v. Yonker, 133 Wn. App. 627, 635, 137 P.2d 888 (2006) (declining to presume a judicial assistant acted improperly where the jury returned a verdict against the defendant shortly after the assistant took the jury to lunch.)

IV.    DNA (deoxyribonucleic acid) Collection Fee

Brown appeals the DNA collection fee imposed as part of his sentence. Pursuant to RCW 43.43.7541, Brown is subject to a fee of $100, "unless the state has previously collected the offender's DNA as a result of a prior conviction."[1] Brown contends, and the State concedes, that the fee should be stricken in this case because the State has previously collected Brown's DNA. We agree.

We affirm Brown's conviction and remand for the trial court to strike the DNA collection fee from the judgment and sentence.

Applewick, C.J.

WE CONCUR:

Mann, A.C.J.                    Andrus, J.

---

[1] This provision of RCW 43.43.7541 was not effective until June 7, 2018, a month following Brown's conviction. LAWS OF 2018, ch. 269, § 18. However, as both parties note, the amendment applies to defendants whose appeals were pending when the bill was enacted. State v. Ramirez, 191 Wn.2d 732, 746-50, 426 P.3d 714 (2018).