[No. 37588-5-II.   Division Two.   October 4, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTHONY SAKELLIS, *Appellant*.

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant.

*Mark E. Lindquist, Prosecuting Attorney,* and *Melody M. Crick, Deputy,* for respondent.

¶1 PENOYAR, C.J. — A jury convicted Anthony Sakellis of second degree assault of Luis Bernal and acquitted him of four other charges. He appeals his conviction, arguing that (1) the trial court erred by failing to instruct the jury that it had to be unanimous as to the specific act constituting the assault, (2) the prosecutor committed flagrant and ill-intentioned misconduct in closing argument by employing a "fill-in-the-blank" argument that misstated the reasonable doubt standard, and (3) his counsel committed ineffective assistance by failing to (a) propose a unanimity instruction and (b) object to the "fill-in-the-blank" argument and request a curative instruction. Additionally, in a statement of additional grounds,[1] Sakellis asserts that the victim's mother spoke to jurors and a witness and that the prosecutor committed perjury while examining a witness. We affirm.

## FACTS

### I. BACKGROUND

¶2 Sakellis and Bernal[2] were friends. They earned money by selling Sakellis's stereo equipment on eBay. They deposited the sale proceeds into a shared PayPal account.

¶3 Bernal also earned money by selling methamphetamine. Abel Contreras was Bernal's supplier. As of December

---

[1] RAP 10.10.

[2] At times, the record refers to the victim and various witnesses by their respective nicknames:

- Luis Bernal = "Taco" (victim)
- Abel Contreras = "Lalo" (convicted in separate trial of Bernal's murder)
- Roman Atofau = "Rome" (witness)
- Jonathan Mayhall = "Lanky" (witness)

10, 2006, Bernal apparently owed Contreras several thousand dollars.

¶4 On the afternoon of December 11, 2006, violence broke out at Bernal's apartment. Sakellis and his friend Jonathan Mayhall were visiting Bernal at his apartment when Contreras, Roman Atofau, and Kelly Kowalski arrived. At trial, Sakellis testified that he was on "[b]ad terms" with Atofau because he believed that Atofau had robbed Sakellis's girl friend. Report of Proceedings (RP) (Feb. 12, 2008) at 2336. At one point, Contreras placed his gun on the coffee table in the living room. Several of the people present were seated on an L-shaped couch around the coffee table. Atofau removed a gun from his sweatshirt pocket and showed it to the others. Sakellis testified that he was scared that Atofau was about to rob or shoot him. Sakellis grabbed Contreras's gun from the coffee table.

¶5 At trial, witnesses gave varying accounts of what happened next. Mayhall testified that Sakellis pointed the gun at Bernal "very briefly" and said, "Remember, Homey, just don't fuck me off." RP (Feb. 4, 2008) at 53. Kowalski testified that Sakellis held the gun to Bernal's head and yelled something about Bernal owing him money. Atofau testified that Sakellis pointed the gun at Bernal and said, "I want my shit." RP (Feb. 11, 2008) at 2170.

¶6 Sakellis equivocated about whether he pointed the gun at Bernal. On cross-examination, the following exchange occurred:

Q: Now, your whole explanation to the jury today is you only armed yourself with a gun because you felt your life was at risk, correct?

A: Yes, sir.

Q: And the only reason you felt you were at risk is because of all these events that you had described you knew about Roman,[3] correct?

A: Yes, and of just what was happening in front of me.

Q: Absolutely. So you have explained all of your actions, everything you did that day, possessing a firearm when you know it's a felony[4] to do so?

A: Yes.

Q: Pointing a gun at two people[5] when you recognized that that could be criminal behavior?

A: Yes.

RP (Feb. 12, 2008) at 2485-86. Later during the State's cross-examination of Sakellis, this exchange occurred:

Q: You pointed the gun at [Bernal], correct?

A: Not pointed. Believe—I don't even think it was a point.

Q: The gun was directed at Taco, correct?

A: No.

RP (Feb. 12, 2008) at 2515.

¶7 Although Sakellis equivocated about whether he pointed the gun at Bernal, he testified that he hit Bernal in the face after he picked up the gun:

Q: [Y]ou can describe what it is that you did.

A: Then I looked to the right of me and Taco is right there, and then I went— I hit him with my hand. I was like, hey,

---

[3] Earlier in his testimony, Sakellis explained that Atofau frequently robbed and assaulted people, including drug dealers and people he contacted through Craigslist, Nickel Ads, and *The Stranger*.

[4] Before trial, Sakellis stipulated that he had been convicted of a "serious offense," making his possession of a firearm a felony under RCW 9.41.040(1)(a). Clerk's Papers at 113-14.

[5] As explained later, there was testimony that Sakellis also pointed the gun at Atofau.

man don't fuck me off.[6] I went straight back and Rome went like that. I said, don't fuck me off.

Q: I am going to stop you right there. You are describing that you reach back and you hit Taco?

A: Yes.

Q: Okay. The gun was in your hands when you hit Taco?

A: Yes.

. . . .

Q: Did the gun make contact with the face?

A: No, I don't think so.

. . . .

Q: You can't be certain if the gun made contact with his face or not?

A: No.

Q: But you know your hands did?

A: Yes.

Q: Okay. Are you claiming any justification for hitting Taco?

A: No.

RP (Feb. 12, 2008) at 2392-94.

¶8 Other trial witnesses provided somewhat different accounts of Sakellis striking Bernal. Atofau testified that Sakellis hit Bernal in the head with the gun, drawing blood, and told him, "You fat mother fucker, you know what I could do to you?" RP (Feb. 11, 2008) at 2205. Mayhall observed Sakellis "slightly backhand[ ]" Bernal in the face with his right hand, which was holding the gun. RP (Feb. 4, 2008) at 59. Sakellis hit Bernal with enough force to "maybe give you a bloody nose but not to break the nose." RP (Feb. 4, 2008) at 60. Mayhall said Bernal appeared injured because he was holding his nose, but Mayhall did not see any blood. Mayhall could not determine whether the gun made contact

---

[6] Sakellis's testimony suggested, by this phrase, he meant that Bernal should not use money from their joint PayPal account to pay Contreras for Bernal's outstanding drug debt.

with Bernal's face. Kowalski testified that she left the apartment after Sakellis aimed the gun at Bernal; thus, she provided no testimony about Sakellis striking Bernal.

¶9 After hitting Bernal, Sakellis aimed the gun at Atofau. Sakellis told Atofau to put his gun down. Contreras then took the gun out of Atofau's hand.

¶10 After disarming Atofau, Contreras yelled something like, "You know why I didn't get my shit yesterday?" or "You know why I fucking didn't re-up?"[7] RP (Feb. 4, 2008) at 61; RP (Feb. 12, 2008) at 2395. Contreras then struck Bernal on the head with the gun with great force. The gun discharged upon impact with Bernal's head, sending a bullet into the wall. At that point, everybody but Contreras and Bernal fled the apartment. Sakellis testified that only a few seconds passed from the moment he took the gun from the coffee table until he fled the apartment.

¶11 After fleeing the apartment, Kowalski, Atofau, and Mayhall heard multiple gunshots from inside the apartment. Bernal died from these gunshot wounds.[8]

¶12 The State charged Sakellis with second degree murder, second degree assault of Atofau, first degree unlawful possession of a firearm, second degree assault of Bernal, and intimidating a witness (Kowalski). Count X of the information alleged that Sakellis assaulted Bernal under RCW 9A.36.021(1)(c), which states that it is second degree assault when a person "assaults another with a deadly weapon." The information did not allege that Sakellis assaulted Bernal under any other subsection of the second degree assault statute.

---

[7] As Mayhall explained, a "re-up" refers to a drug dealer's receipt of a new supply of drugs. Mayhall interpreted Contreras's statement as blaming Bernal for preventing him from receiving a new supply of drugs.

[8] The State charged Contreras with first degree murder and other crimes. *See State v. Contreras*, noted at 157 Wn. App. 1043, 2010 WL 3313402, at *2, 2010 Wash. App. LEXIS 1930, at *4-5, *review denied*, 170 Wn.2d 1025 (2011). Upon Sakellis's motion, the trial court severed Sakellis's and Contreras's trials. The jury found Contreras guilty as charged, and we affirmed Contreras's convictions. *Contreras*, 2010 WL 3313402, at *3, *7, 2010 Wash. App. LEXIS 1930, at *10, *23.

## II. Procedure

¶13 Sakellis's trial began on January 29, 2008 and spanned several days. In its opening argument, the State told the jury:

> [T]he evidence will show you that . . . the Defendant retrieved the gun from a coffee table in this small congested apartment complex where Taco lived. He armed himself with this chrome revolver as witnesses will describe it, and immediately and abruptly approached Taco . . . and he struck him in the face so severely with his handgun that he drew blood.
>
> This is . . . the first step[ ] in this series of events where a gun, or violence, has been introduced, and it's been introduced by this man right here. You will hear that the evidence will support the crime of assault in the second degree that the State has charged the Defendant for striking Taco in the face with a handgun.

RP (Jan. 29, 2008) at 1322-23.

¶14 At trial, the witnesses testified consistent with the statement of facts above. Additionally, Andrea Rideout, a friend of Bernal's, testified that Sakellis called Bernal on his cell phone two days before the murder. Rideout answered the call, and Sakellis asked to speak with Bernal. Rideout responded that Bernal was sleeping, and Sakellis told her to wake him up. When Rideout told Sakellis that she had been unable to rouse Bernal, Sakellis stated with anger, "I am going to kill that fat fuck." RP (Jan. 30, 2008) at 1569. Rideout assumed that Sakellis's anger had to do with money because he and Bernal were business partners. Knowing that Bernal owed other people money, she offered to give $450 to Sakellis. He accepted the offer, and she paid him through an intermediary.

¶15 Atofau also testified that he was in Bernal's apartment the night before the murder. Atofau overheard a telephone conversation between Sakellis and Bernal. Sakellis demanded $10,000 in money orders from Bernal. Atofau also

overheard Sakellis tell Bernal, "I will come over there and tell him myself." RP (Feb. 11, 2008) at 2191.

¶16 At the close of trial, the trial court instructed the jury that (1) a person commits second degree assault "when he or an accomplice assaults another with a deadly weapon" (instruction 8) and (2) a firearm, whether loaded or unloaded, is deadly weapon. Clerk's Papers (CP) at 269; *accord* RCW 9A.04.110(6) (defining "deadly weapon"); RCW 9A.36.021(1)(c). The trial court also provided the following assault instruction, which is modeled after the pattern instruction:

> An assault is an intentional[ ] touching, striking, or shooting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching, striking, or shooting is offensive, if the touching, striking, or shooting would offend an ordinary person who is not unduly sensitive.
>
> An assault is also an act, with unlawful force, done with intent to inflict bodily injury upon another, tending, but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
>
> An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 270; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.50, at 547 (3d ed. 2008). The trial court also provided the jury with (1) a self-defense instruction for the second degree assault of Atofau, (2) a necessity defense instruction for unlawful firearm possession, and (3) an inferior degree offense instruction (fourth degree assault) for the second degree assault of Bernal.

¶17 In closing argument, the State explained to the jury that Sakellis assaulted Bernal by pointing a gun at him and by hitting him with the gun:

The next count, Count X, . . . is uncontested. The Defendant assaulted Luis with a gun. The Defendant told you, or he offered no explanation whatsoever that while holding the gun, he backhanded Luis in the face, and that is an assault.

. . . .

We know that he was armed with that gun when he backhanded Luis in the face.

. . . .

Kelly, Lanky, Roman and the Defendant all told you that he was armed with that gun when he backhanded and pointed the gun at Luis. . . . [A]ll of the witnesses who observed that event indicated that the Defendant pointed the gun first at Luis, and then turned it towards Roman Atofau. And then there was apparently some movement at which point he backhanded Taco in the face, and redirected the gun back to Luis.[9]

. . . .

There [were] really two assaults on Luis that night. We know that he backhanded him and pistol whipped Luis, which is with a gun, and Lanky testified to that. Rome testified to that, and the Defendant admitted to that. After that event there has been various people describing how Taco reacted, and that he, in fact, was bleeding from the injury.

. . . .

We know it was a deadly weapon that he used in the commission of this assault, and so the Defendant is guilty of assault in the Second Degree for assaulting Luis on December 11th.

RP (Feb. 14, 2008) at 2825, 2827, 2829, 2833-34.

¶18 While making this argument, the State also showed the jury the following PowerPoint slides to reiterate its argument that Sakellis assaulted Bernal by pointing a gun at him and by hitting him with the gun:

---

[9] Here, the prosecutor apparently meant to say "back to Atofau."

> Defendant pointed gun
> at Luis and Rome = Assault 2
>
> - Instruction [8]
> - A person commits the crime of ASSAULT IN THE SECOND DEGREE when he or an accomplice assaults another with a deadly weapon.

> Uncontested Evidence
> (Assault on Luis)
>
> Count X: Assault in the Second Degree (Luis Bernal)
>
> Kelly
> Lanky
> Rome
> Defendant

> Defendant assaulted Luis Bernal with a deadly weapon
>
> Defendant angry with Luis over money
> Phone call days prior
> "I'm going to kill that fat fuck!"          Andrea
>
> Phone call day of murder demanding
> $10k in money orders
> "I'll come over there and tell          Rome
> him myself!"

Defendant pointed gun at Luis and argued about money

Defendant jumped up and held gun to Taco's head, yelled something about money
Kelly

"You fat motherfucker, you know what I could do to you?"
Rome

"Don't fuck me off"
Lanky

---

Defendant assaulted Luis a second time

Back handed pistol whipped
Luis with gun
Lanky
Rome

"I'm bleeding," hand to face,
blood observed
Kelly
Rome
"No justification for hitting Taco"

---

DEFENDANT ASSAULTED
LUIS WITH DEADLY WEAPON

GUILTY

CP at 242-43 (illustrations omitted).

¶19 In closing, the State explained how Sakellis had committed second degree murder:

The felony murder[ ] rule indicates the Defendant was an accomplice to Lalo's assault on Luis, and then Lalo murdered Luis during the immediate flight from the assault, and that

evidence is clear. And because of that evidence, the Defendant is liable as an accomplice to murder.

RP (Feb. 14, 2008) at 2841. The State also showed PowerPoint slides to the jury that were consistent with this argument.

¶20 The State discussed the reasonable doubt standard in its closing argument:

> Reasonable doubt is defined in the jury instructions and . . . I am not going to read it to you word for word. It's an instruction created by lawyers, and sometimes not very helpful because it uses the words to define itself. A reasonable doubt is one for which a reason exists, but it's hard. That is helpful. It's a doubt for which you have an abiding belief no matter what. It doesn't say—it says it's one for which a reason exists.
>
> In order for you to say the Defendant is not guilty you have to ask yourself, or answer this question. You have to say I have doubt the Defendant did this. For you to find the Defendant not guilty you have to fill in that blank because to have a reasonable doubt, it's one for which a reason exist[s], and you should be able to articulate the doubt which you have, nor does it say beyond any doubt, beyond a shadow of a doubt, beyond a hundred percent certainty, or beyond all doubts.

RP (Feb. 14, 2008) at 2893-94. While discussing the reasonable doubt standard, the State displayed the following PowerPoint slide:

| WHAT IT SAYS |
| --- |
| A doubt for which a reason exists |
| In order to find the defendant not guilty, you have to say: "I doubt the defendant is guilty, and my reason is _____." |
| And you have to fill in the blank |

CP at 257.

¶21 The jury convicted Sakellis of the second degree assault of Bernal and acquitted him on all other charges. Sakellis appeals his conviction.

## ANALYSIS

PROSECUTORIAL MISCONDUCT

¶22 Sakellis argues that the prosecutor committed misconduct during closing argument by employing a "fill-in-the-blank" argument that misstated the reasonable doubt standard. He further asserts that the prosecutor's use of the PowerPoint slide to illustrate the "fill-in-the blank" argument constituted "especially egregious" misconduct because visual aids are "more memorable for jurors" during deliberations. Appellant's Br. at 38-39. We conclude that Sakellis's argument fails because he cannot demonstrate that he suffered an enduring and resulting prejudice from the prosecutor's "fill-in-the-blank" statement and PowerPoint presentation.

¶23 Before proceeding further, we pause to consider the continuing use of the term "waiver" in cases where a defendant raises a claim of prosecutorial misconduct on appeal without having objected to the alleged misconduct at trial. Several cases characterize the defendant's failure to object to the alleged misconduct at trial as a "waiver" of any error. *See, e.g., State v. Thorgerson*, 172 Wn.2d 438, 258 P.3d 43, 46 (2011); *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009); *State v. Gregory*, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006). But reliance on the term "waiver" in this context invites an overly simplistic analysis that is based on purely procedural grounds. The proper analysis turns not on the mere fact of the defendant's objection or lack thereof but also on the existence, nature, and extent of any prejudice that results from the prosecutor's alleged misconduct. *See State v. Emery*, 161 Wn. App. 172, 196 n.7, 253 P.3d 413, *review granted*, 172 Wn.2d 1014 (2011).

¶24 A defendant claiming prosecutorial misconduct on appeal must demonstrate that the prosecutor's conduct at trial was both improper and prejudicial. *Fisher*, 165 Wn.2d at 747. Once a defendant has demonstrated that the prosecutor's conduct was improper, we evaluate the defendant's claim of prejudice on the merits under two different standards of review depending on whether the defendant objected at trial.

¶25 If the defendant objected to the misconduct, we determine whether the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009) (citing *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984)), *review denied*, 170 Wn.2d 1002 (2010). If the misconduct did not result in prejudice that had a substantial likelihood of affecting the verdict, our inquiry ends and the claim fails. *See, e.g., Anderson*, 153 Wn. App. at 429 (defendant's prosecutorial misconduct claim failed on appeal when he objected to prosecutor's misconduct at trial but failed to demonstrate that the misconduct had a substantial likelihood of affecting the verdict).

¶26 Alternatively, if the defendant failed to object to the prosecutor's misconduct at trial, we apply a different level of scrutiny to ascertain whether the prosecutor's misconduct was so flagrant and ill intentioned that it caused an " 'enduring and resulting prejudice' " incurable by a jury instruction. *Gregory*, 158 Wn.2d at 841 (quoting *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). This standard requires the defendant to establish that (1) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict" and (2) no curative instruction would have obviated the prejudicial effect on the jury. *Thorgerson*, 172 Wn.2d at 455; *see also State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994) (a defendant cannot demonstrate "enduring and resulting prejudice" without demonstrating "a substantial likelihood that the alleged prosecutorial misconduct affected the verdict").

¶27 Neither of these standards involves "waiver," which is the voluntary relinquishment of a known right. *See State v. Vy Thang*, 145 Wn.2d 630, 648, 41 P.3d 1159 (2002) (citing BLACK'S LAW DICTIONARY 1574 (7th ed. 1999)). When defense counsel fails to object to a prosecutor's alleged misconduct at trial, it cannot be said that the defendant has *knowingly relinquished* his or her right to obtain a more favorable standard of review with regard to the resulting prosecu-

torial misconduct claim on appeal. What can be said is that the defendant has *failed to preserve* his or her right to obtain the more favorable standard of review by depriving the trial court of the opportunity to correct the claimed error.

¶28 Thus, we urge the abandonment of the use of the term "waiver" when analyzing prosecutorial misconduct claims. Instead, courts should simply apply the appropriate standard of review depending on whether the defendant objected to the misconduct at trial. Reliance on the concept of "waiver" can cause parties to believe, erroneously, that appellate courts will not scrutinize the merits of a claim of prosecutorial misconduct when the defendant did not object to the alleged misconduct at trial. This erroneous assumption may lead, in turn, to less rigorous briefing and analysis of the claim's merits by the parties on appeal.

¶29 We turn now to the threshold question of whether the prosecutor's arguments here were improper. We review the prosecutor's comments during closing argument in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

¶30 We have repeatedly held that the "fill-in-the-blank" argument is improper. *State v. Johnson*, 158 Wn. App. 677, 684-85, 243 P.3d 936 (2010), *review denied*, 171 Wn.2d 1013 (2011); *State v. Venegas*, 155 Wn. App. 507, 523-24, 228 P.3d 813, *review denied*, 170 Wn.2d 1003 (2010); *Anderson*, 153 Wn. App. at 431. As we have explained:

> The jury need not engage in any such thought process. By implying that the jury had to find a reason in order to find [the defendant] not guilty, the prosecutor made it seem as though the jury had to find [the defendant] guilty *unless* it could come up with a reason not to. Because we begin with a presumption of innocence, this implication that the jury had an initial affirmative duty to convict was improper. Furthermore, this argument implied that [the defendant] was responsible for supplying such a reason to the jury in order to avoid conviction.

*Anderson*, 153 Wn. App. at 431.

¶31 Despite the impropriety of the prosecutor's "fill-in-the-blank" argument, however, Sakellis cannot demonstrate an enduring and resulting prejudice because he cannot demonstrate a substantial likelihood that the prosecutor's "fill-in-the-blank" argument affected the jury's guilty verdict. *See Thorgerson*, 172 Wn.2d at 454-55. Here, the State had to prove that Sakellis assaulted Bernal with a loaded or unloaded firearm. RCW 9A.36.021(1)(c); *see also* RCW 9A.04.110(6). An "assault" includes, in relevant part, an unlawful touching (actual battery) and putting another person in apprehension of harm. *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). Three witnesses testified that Sakellis pointed the gun at Bernal or held it to his head. Such an act would have caused "apprehension and fear of bodily injury" on Bernal's part. CP at 270. Additionally, Sakellis testified that he hit Bernal while the gun was in his hands, although his testimony was not entirely clear as to whether he used his gun hand. Two witnesses—Atofau and Mayhall—testified that Sakellis used his gun hand to hit Bernal, and Atofau specifically testified that Sakellis struck Bernal with the gun. Taken together, this testimony is very strong evidence that Sakellis unlawfully touched Bernal with a deadly weapon.

¶32 Because of the strength of the evidence that Sakellis assaulted Bernal with a deadly weapon, there is not a substantial likelihood that the prosecutor's "fill-in-the-blank" argument affected the jury's guilty verdict. Accordingly, because the "fill-in-the-blank" argument in this case was not so flagrant and ill intentioned as to cause an enduring and resulting prejudice, Sakellis's claim fails.

¶33 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

VAN DEREN and JOHANSON, JJ., concur.