# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 71218-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| PEDRO MENDOZA-ESCATEL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 27, 2015 |
| | ) | |

LAU, J. — Pedro Mendoza-Escatel appeals his conviction for assault in the second degree. He contends (1) there was insufficient evidence to prove the strangulation element beyond a reasonable doubt and (2) statements made during the State's rebuttal argument amount to prosecutorial misconduct that deprived him of his right to a fair trial. But because we conclude (1) that the State presented sufficient evidence such that any reasonable trier of fact could conclude the element of strangulation proven beyond a reasonable doubt and (2) that the prosecutor's comments, even if improper, were cured by the trial court's curative instruction, we affirm the judgment and sentence.

## FACTS

Pedro Mendoza-Escatel was romantically involved with Katie McAlpin. On May 6, 2013, Mendoza-Escatel met Katie and her sister Molly[1] for food and drinks at the Little Water Cantina. While there, Mendoza-Escatel became drunk, angry, and loud, so Katie and Molly left without him. Katie and Molly gave slightly different accounts of where they went after leaving the Little Water Cantina. Molly testified that they went directly to Katie's apartment. Katie testified that she and Molly had additional drinks at a different restaurant before returning to her apartment.

Regardless, at some point the sisters returned to Katie's apartment where they met Mendoza-Escatel on the street in front of the building. Katie then got into an argument with Mendoza-Escatel.[2] Specifically, Mendoza-Escatel's pants were undone and he admitted to having sexual relations with another woman.

Once inside the apartment, both Katie and Molly asked Mendoza-Escatel to leave. When Mendoza-Escatel did not leave, Katie attempted to physically pull him off of the couch he was sitting on in an attempt to force him out of the apartment. After several unsuccessful attempts to remove him from the couch, Mendoza-Escatel grabbed Katie's throat and began to squeeze. Katie testified that the choking obstructed her breathing.

---

[1] Because Katie and Molly share the same last name, we refer to them by their first names.

[2] Katie's testimony differs slightly with Molly's on this point as well. Katie testified that the argument started in the street outside the apartment. Molly testified that the argument started in the apartment. Regardless of where the argument began, it continued inside the apartment and culminated with violence inside the apartment.

> [Prosecutor]: How long did it feel to you?
> [Katie]: It felt like I was losing my breath; like I couldn't breathe, I couldn't talk.
> [Prosecutor]: Okay. And how hard was he actually pressing on your neck area?
> [Katie]: Really hard.
> [Prosecutor]: Okay.
> [Katie]: Like squeezing it really hard.
> [Prosecutor]: And can you show us again the hold that he was using?
> [Prosecutor]: He squeezed right here where my windpipe is.

Report of Proceedings (RP) (Oct. 8, 2013) at 155. Mendoza-Escatel continued to hold

Katie down on the couch and choke her. At some point he released her, and Katie

screamed for Molly, who was in the bathroom trying to call a male friend to come over

and help. After Molly came out of the bathroom, Mendoza-Escatel grabbed Katie's

throat a second time:

> [Prosecutor]: And was it the same type of hold that he had [used the first time]?
> [Katie]: Yeah.
> [Prosecutor]: How hard was he squeezing that part of your neck?
> [Katie]: It was really hard. It hurt really bad. It felt like something maybe was even like fractured in there after he did it.
> [Prosecutor]: And during the second time that he did this, were you able to talk or breathe?
> [Katie]: No.
> [Prosecutor]: Did you lose consciousness at any point in time?
> [Katie]: No.
> [Prosecutor]: And during this period of time, were you able to communicate with Molly the second time he squeezed [your throat]?
> [Katie]: No. She came up and said, what are you doing to my sister, and she slapped him, and he let go.

RP (Oct. 8, 2013) at 156. Molly then left the room to call the police. After Molly left,

Mendoza-Escatel choked Katie a third time and then tried to "put his hand down [her]

throat." RP (Oct. 8, 2013) at 158. Eventually, Katie got away and she and Molly left the

apartment to wait for police, who arrived 20 minutes later. Police arrested Mendoza-Escatel, who was noticeably drunk.

During the State's rebuttal closing argument, the prosecutor stated that "[t]here has been no evidence in this case whatsoever to disprove that he strangled her." RP (Oct. 9, 2013) at 90. Defense counsel objected to the statement because it suggested Mendoza-Escatel failed to meet an evidentiary burden. The court sustained the objection. The prosecutor continued:

> Okay. There has been—you have heard no evidence in this case that strangulation did not occur, and there has been numerous cross-examination of these witnesses. They all said the same thing: that he choked her or that Ms. [Katie] McAlpin reported that she was choked. You heard from none of them that, well, she never claimed she was choked, or I thought he was choking her, but I might have been mistaken. Well, his hand was kind of around her face and I thought she was being choked. You didn't hear none of that. And that's what I'm—that's what I'm implying when I say that there is no evidence. You've heard nothing to contradict that—those assertions.

RP (Oct. 9, 2013) at 90–91. At the close of the prosecutor's rebuttal, the court reminded the jury of the defense objection and that Mendoza-Escatel had no evidentiary burden:

> Ladies and gentlemen, the Prosecutor argued to you that the Defense had not disproved that strangulation occurred. Defense counsel objected, I sustained the objection, and I want to reiterate that. And I'm reading from Instruction No. 3, the State is the Plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt. The Defendant has no burden of proving that a reasonable doubt exists as to these elements.

RP (Oct. 9, 2013) at 92. The jury convicted Mendoza-Escatel of assault in the second degree.[3] The court sentenced Mendoza-Escatel to six months incarceration. Mendoza-Escatel appeals.

## ANALYSIS

### Sufficiency of the Evidence

First, Mendoza-Escatel argues the State failed to prove assault by strangulation because the evidence was insufficient to show that he obstructed Katie's blood flow or ability to breathe or that he intended to obstruct Katie's blood flow or ability to breathe. We disagree.

In a criminal prosecution, the State must prove each element of the charged crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d. 368 (1970). A person is guilty of the crime of assault in the second degree by strangulation where he "[a]ssaults another by strangulation." RCW 9A.36.021(1)(g). "'Strangulation' means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. A claim of insufficiency admits the

---

[3]The amended information also charged the lesser-included crime of fourth degree assault.

truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citations omitted).

Under this onerous standard, we conclude the State presented sufficient evidence such that any rational trier of fact could have concluded that Mendoza-Escatel was guilty of assault by strangulation. See Salinas, 119 Wn.2d at 201.

Katie specifically testified that Mendoza-Escatel obstructed her breathing when he strangled her. She stated that he grabbed and squeezed her throat three times during the altercation. Regarding the first instance, Katie said that Mendoza-Escatel "squeezed" her "windpipe" "really hard" such that she "couldn't talk" and "couldn't breathe." RP (Oct 8, 2013) at 155. Katie testified that, during the second instance, Mendoza-Escatel squeezed her throat so hard it felt like something had fractured. She again stated she could not talk or breathe during Mendoza-Escatel's second attack. Katie stated that Mendoza-Escatel choked her a third time and then attempted to insert his fist down her throat. She stated that this also affected her ability to breathe. Katie also identified bruises on her neck in photographs taken a few days after the incident.

Other witnesses corroborated Katie's testimony. For instance, the responding officer testified that Katie accused Mendoza-Escatel of choking her:

> [Prosecutor]: Okay. And what did [Katie] say had happened?
> [Officer]: She said that her and her boyfriend, the Defendant, had gotten into an argument . . . She asked him to leave, and he then assaulted her by grabbing her around the neck with her or with his right hand and choking her, cutting off her breathing. She was able to fight him off a little bit and then he continued. He did it twice more in the same manner with his right hand cutting off her breathing each time.

RP (Oct. 8, 2013) at 23 (emphasis added). Molly also testified that Mendoza-Escatel choked Katie three times. She witnessed Katie's labored breathing as a result of the attack:

> [Prosecutor]: Okay. And when you walked out [of the bathroom], what did you see?
>
> [Molly]: A red face with her eyes—he let go of her when I walked out and she was crying and she was gasping for air.

RP (Oct. 8, 2013) at 82. She later described Katie as "sitting down trying to get her air." RP (Oct. 9, 2013) at 83.

Viewing this evidence and the reasonable inferences in the light most favorable to the State, ample evidence supports Mendoza-Escatel's conviction. Assault by strangulation requires that the defendant "compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). The testimony from several witnesses during Mendoza-Escatel's trial indicates that he either obstructed Katie's ability to breathe or compressed her neck with the intent to obstruct her ability to breathe.[4] Therefore, we conclude the State presented sufficient evidence such that any reasonable trier of fact could have found the strangulation element proven beyond a reasonable doubt. See Salinas, 119 Wn. 2d at 201.

---

[4] Mendoza-Escatel claims that "[a]lthough she stated that she was 'losing my breath' during this incident, Katie acknowledged that she never lost consciousness." Br. of Appellant at 8. But whether Katie lost consciousness or not is irrelevant. The State need only prove that Mendoza-Escatel compressed Katie's neck with the intent to obstruct her blood flow or breathing or that he actually obstructed her blood flow or breathing. As explained above, the State presented sufficient evidence to prove this element.

## Prosecutorial Misconduct

Next, Mendoza-Escatel argues the prosecutor's improper statements during rebuttal deprived him of his right to a fair trial. We conclude, however, that Mendoza-Escatel has failed to show that any prosecutorial conduct—even if improper—had a substantial likelihood of affecting the jury verdict.

A defendant claiming prosecutorial misconduct on appeal must demonstrate that the prosecutor's conduct at trial was both improper and prejudicial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "Once a defendant has demonstrated that the prosecutor's conduct was improper, we evaluate the defendant's claim of prejudice on the merits under two different standards of review depending on whether the defendant objected at trial." State v. Sakellis, 164 Wn. App. 170, 183, 269 P.3d 1029 (2011). "If the defendant objected to the misconduct, we must determine whether the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict." State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). If the defendant failed to object, we must ascertain whether the prosecutor's misconduct was so flagrant and ill-intentioned that it caused an "enduring and resulting prejudice" incurable by a jury instruction. State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). "This standard requires the defendant to establish that (1) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict,' and (2) no curative instruction would have obviated the prejudicial effect on the jury." Sakellis, 164 Wn. App. at 184 (quoting State v. Thorgerson 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Here, Mendoza-Escatel notes that defense counsel objected to some of the prosecutor's statements but failed to object to others. But we conclude Mendoza-Escatel's claim for prosecutorial misconduct fails under either standard. Even if we assume, without deciding, that the prosecutor's comments were improper, Mendoza-Escatel has failed to show a substantial likelihood that these comments affected the verdict. See Sakellis, 164 Wn. App. at 184.

Any prejudicial effect from the prosecutor's comments was mitigated by the trial court's curative instruction. Following rebuttal, the trial court admonished the jury that it sustained defense counsel's objection. The trial court also turned the jury's attention to jury instruction 3, which reiterated that the State had the burden of proving all elements of the crime beyond a reasonable doubt and that the defendant had no burden of proving a reasonable doubt existed.

Curative instructions such as the one provided by the court here generally cure prejudicial comments made by prosecutors. See State v. Warren, 165 Wn.2d 17, 28–29, 195 P.3d 940 (2008). In Warren, a prosecutor suggested that the jury need not "give the defendant the benefit of the doubt." Warren, 165 Wn.2d at 25. The trial court then provided a curative instruction explaining the role of reasonable doubt in reference to the relevant jury instruction. Warren, 165 Wn.2d at 25. Our Supreme Court found this instruction cured any prejudice: "Had the trial judge not intervened to give an appropriate and effective curative instruction, we would not hesitate to conclude that such a remarkable misstatement of the law by a prosecutor constitutes reversible error. However, reviewing the argument in context, because Judge Hayden interrupted the prosecutor's argument to give a correct and thorough curative instruction, we find that

any error was cured." Warren, 165 Wn.2d at 28. Similarly, in State v. Emery, 174 Wn.2d 741, 278 P.3d 653 (2012), a prosecutor made improper comments during closing argument. Defense counsel, however, failed to object and the trial court gave no curative instruction. Emery, 174 Wn.2d at 763–64. The court found the defendants' claim failed because an instruction would have cured any prejudice had it been given:

> [T]he misstatements here could have been cured by a proper instruction. If either [defendant] had objected at trial, the court could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden. Such an instruction would have eliminated any possible confusion and cured any potential prejudice stemming from the prosecutor's improper remarks.

Emery, 174 Wn.2d at 764 (emphasis added). The curative instruction described by the court in Emery is precisely the instruction provided by the trial court in this case. Further, "[w]e presume the jury was able to follow the court's instruction." Warren, 165 Wn.2d at 28. Accordingly, even if the prosecutor's comments were improper, any prejudicial effect was cured by the trial court's instruction. Therefore, Mendoza-Escatel failed to show a substantial likelihood that the prosecutor's comments affected the verdict.

Mendoza-Escatel relies on In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 286 P.3d 673 (2012) for the proposition that "the cumulative effect of repeated burden-shifting during rebuttal was so flagrant that no instruction or series of instructions could have erased its combined prejudicial effect." Br. of Appellant at 12. But the prosecutorial misconduct in Glasmann was far more egregious than any statements made in this case. In Glasmann, the prosecutor used a slide show during closing argument containing several prejudicial images of the defendant with superimposed

captions such as "GUILTY!" <u>Glasmann</u>, 175 Wn.2d at 700–02. The court found that the use of this slideshow amounted to reversible misconduct: "Given the multiple ways in which the prosecutor attempted to improperly sway the jury and the powerful visual medium he employed, no instruction could erase the cumulative effect of the misconduct in this case. The prosecutor essentially produced a media event with the deliberate goal of influencing the jury to return guilty verdicts on the counts against Glasmann." <u>Glasmann</u>, 175 Wn.2d at 708. Nothing in this case matches the severity of the misconduct in <u>Glasmann</u>.

CONCLUSION

Because the State presented sufficient evidence such that any reasonable trier of fact could conclude the element of strangulation proven beyond a reasonable doubt, and because Mendoza-Escatel fails to show a substantial likelihood that any of the prosecutor's comments affected the verdict, we affirm the judgment and sentence.

WE CONCUR: