# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　Respondent,<br><br>　　v.<br><br>EVAN NEIL SMITH,<br><br>　　　　　Appellant. | No. 79087-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: March 9, 2020 |

APPELWICK, C.J. — Smith appeals his convictions for indecent liberties by forcible compulsion, attempted second degree rape, and fourth degree assault. He argues that the trial court abused its discretion in failing to instruct the jury on the missing witness doctrine. He contends that the prosecutor committed incurably prejudicial misconduct during closing arguments. Further, he asserts that he received ineffective assistance of counsel due to his trial counsel's failure to object to the prosecutor's misconduct. He also asserts that cumulative error deprived him of his right to a fair trial. Last, he argues that the provision in his judgment and sentence imposing interest on nonrestitution LFOs must be stricken. We affirm Smith's convictions, but remand to the trial court to strike the provision requiring interest accrual on nonrestitution LFOs.

## FACTS

Late at night on December 12, 2016, and into the early morning hours of December 13, Evan Smith went out walking in his neighborhood in rural Arlington.

He was carrying and drinking beer. One of Smith's neighbors, Crystal Chiechi, was up late on December 12 watching television. At around 11:30 p.m., she was startled to see Smith standing outside her back room window, motioning towards her back door. Chiechi's boyfriend was friends with Smith's dad, but she did not know Smith very well.

Assuming her boyfriend would be home soon, Chiechi went out on her back porch and engaged in small talk with Smith. However, he quickly started making comments that Chiechi found bizarre. For example, when she asked Smith what he did for fun, he responded that he liked to go to the brewery in town, but that "all the women around here are either taken or they're only 13 right now."

Later in the conversation, Smith told Chiechi that she and her boyfriend should start having kids. He then grabbed her right hip and told her that her "hips need a baby between them." Chiechi started to panic. Smith then tried to get her to go into her detached garage with him to look for something an old owner might have left behind. Chiechi responded that they needed to wait until her boyfriend got home. Smith kept insisting that they go into the garage, at which point Chiechi saw her boyfriend's car coming down the road. Smith left soon after her boyfriend arrived.

Shortly after midnight, another neighbor of Smith's, M.G., heard her dogs barking in an unusual manner. M.G. stuck her head out her door and saw Smith standing about six feet away. He was reaching into a box of beer that she kept outside. Smith had stopped at her home on two previous occasions to talk to her husband, but M.G. had not spent time with him before. Because the roads were

2

icy and Smith was on foot, M.G. thought that he might have wrecked his car. Her husband was asleep, so she went outside to see if she could help. Once she got outside, Smith told her that he had just left Chiechi's house and had noticed her outside. M.G. had taken her dogs outside about 15 minutes prior.

Smith initially told M.G. that he was going to get on her roof and fix her chimney, which had a tarp on it. He wanted to get a ladder, and tried pulling her towards her shop to find one. M.G. told Smith that she did not want him to fix her chimney, and refused to go with him to her shop. At that point, M.G.'s daughter, L.G., came outside. Smith let go of M.G.'s arm, and Smith and L.G. engaged in a snowball fight. At one point during the snowball fight, Smith walked behind M.G. and cupped her buttocks. M.G. reacted by shoving his hand away. Smith did not touch M.G. again while her daughter was outside.

Once the snowball fight started to wind down, Smith went to the side of M.G.'s garage and urinated in full view of both M.G. and L.G. Around this time, M.G. let one of her dogs outside, and it lunged at Smith. She had never seen her dog react that way, so she put it in the garage. As M.G. retrieved her dog, Smith and L.G. had a conversation about dogs, during which Smith demonstrated how he would gut a dog with a pocket knife. He pulled out a pocket knife and pretended to gut a dog in the air.

At that point, M.G. put L.G. inside. She did not wake up her husband because she felt like she could handle the situation. However, she told L.G. to open the door every two minutes. She hoped that if L.G. kept opening the door,

3

she would have an excuse to go back inside. She had already told Smith that she needed to go to bed, but was unsure if he would try to follow her if she went inside.

About two minutes later, L.G. came back outside and asked for a bowl of snow. M.G. grabbed the bowl and got some snow for L.G. During this time, Smith yelled at L.G. to get back in the house. L.G. went back inside. M.G. became angry that Smith had yelled at her daughter, and told him again that he needed to leave.

Smith then urinated a second time on M.G.'s porch. As he was urinating, he asked M.G. for a ride to Arlington so that he could meet a bartender. M.G. told him that she was not going anywhere. Smith then told her that if she was not going to take him to Arlington, she needed to perform oral sex on him. M.G. was taken aback and laughed in disbelief. At that point, she handed Smith a beer and grabbed one for herself. Smith had already had several beers. She told Smith that nothing was going to happen between them.

M.G. then went to light a cigarette. As she bent down to use her lighter, Smith grabbed her by the collar and flung her 8 to 10 feet onto the hood of her car. She became very scared and remembered saying, "[N]o, no, no, no." With her body on the car and Smith behind her, Smith tried reaching under her pullover shirt and removing her leggings. He called her a "dirty bitch" and said that she "would like it rough." M.G. eventually heard her daughter crack the doorknob and was able to spin around. L.G. did not actually come outside. Smith then backed away from M.G., at which point she saw that his penis was fully exposed. M.G. did not scream for help in part because she did not want her to daughter to come outside.

4

M.G. again told Smith that he needed to go home, and that nothing was going to happen between them. She tried to calm down and grabbed another cigarette. However, Smith took the cigarette from her, grabbed her hand, and shoved her hand down his pants. He wrapped her hand around his penis and began stroking it as he was talking to her. L.G. then opened the door. M.G. was able to remove her hand from Smith's pants as L.G. popped her head outside. She did not actually step outside, and shut the door after making eye contact with M.G. Smith also zipped up his pants and backed away. He told M.G. that she was right and that he should go.

M.G. grabbed another beer for Smith, and told him to take it and leave. Smith then pushed her up against a pole about two feet from where she was standing. He grabbed her right leg, pried her thigh open, shoved his hand into her vaginal area, and forcibly rubbed the area through her leggings. M.G. was able to shove Smith, who stumbled backwards. Smith then slapped M.G. in the face and pinched both of her cheeks. Afterwards, he finally left. M.G. then went inside, woke up her husband, and called 911.

The State later charged Smith with indecent liberties by forcible compulsion, attempted second degree rape, and fourth degree assault. The jury in Smith's first trial was unable to reach a verdict. As a result, the court declared a mistrial. At his second trial, Smith requested that the court give a "missing witness instruction" regarding M.G.'s daughter, L.G., who the State did not call as a witness. The court denied Smith's request.

A jury found Smith guilty as charged. The court imposed a total minimum term of 89.25 months of confinement to a maximum term of life. It also imposed a $500 victim assessment and a $100 biological sample fee. The judgment and sentence provided that the legal financial obligations (LFOs) imposed "shall bear interest from the date of the judgment until payment in full."

Smith appeals.

## DISCUSSION

Smith makes four arguments. First, he argues that the trial court abused its discretion in failing to give a missing witness instruction regarding L.G. Second, he argues that the prosecutor committed incurably prejudicial misconduct during closing arguments. Third, he argues that he received ineffective assistance of counsel due to his trial counsel's failure to object to the prosecutor's misconduct. Fourth, he argues that the provision in his judgment and sentence imposing interest on nonrestitution LFOs must be stricken.

I.   Failure to Give Missing Witness Instruction

Smith argues first that the trial court abused its discretion in denying his request for a missing witness instruction. He asserts that, because the State did not call L.G. as a witness, he was permitted to an instruction that the jury could infer that L.G.'s testimony would have been unfavorable to the State.

"A missing witness instruction informs the jury that it may infer from a witness's absence at trial that his or her testimony would have been unfavorable to the party who would logically have called that witness." State v. Reed, 168 Wn. App. 553, 571, 278 P.3d 203 (2012). Such an instruction is proper when (1) the

6

missing witness's testimony is material and not cumulative, (2) the witness is particularly available to only one of the parties and not equally available to both parties, and (3) the witness's absence is not satisfactorily explained. State v. Montgomery, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008). We review a trial court's refusal to give a requested instruction based on the evidence in the case for abuse of discretion. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).

Smith contends L.G. was a material witness. The record does not support this argument. After Smith requested a missing witness instruction regarding L.G., the trial court stated that it did not view her potential testimony as "very significant" in relation to the charges. The court asked counsel for Smith what "significant information" in L.G.'s forensic interview she thought should have been testified to that was not cumulative. The following exchange then took place:

> [COUNSEL]: Well, the --
>
> THE COURT: Because the only thing that I understood really was perhaps the daughter saw him urinating outside and the issue related to the knife, which to me, frankly, are not significant.
>
> I guess the other thing is, and I don't know and maybe this is not relevant, really, this inquiry, but what if the child just didn't observe anything, the child was just there?
>
> [COUNSEL]: Well, I think that is the issue, that is why the State didn't call the child. She came out several times when Mr. Smith was present and didn't ever see Mr. Smith close to her mother. The mother testified that in the incident up against the pole that the door opened, the child stepped out when Mr. Smith was making [M.G.] touch his penis. The child never saw anything. She was a very accurate historian of what she saw. She never saw --
>
> THE COURT: So you're telling me, then, that the child -- when the child came out, the specific testimony is that when she observed

your client and [M.G.] that they were not in close proximity to each other?

[COUNSEL]: She never saw them do anything --

THE COURT: That's not my question. She may not have been in the position where she could have observed it, but you seem to indicate that the child said they were not in close proximity, and if that's the case, that may be a material issue in relation to the allegations in this case. But I don't know what the interview says, so I'm asking you, you made a representation that to me sounded like the child indicated they weren't even in close proximity.

In response, counsel for Smith did not state that L.G. actually said Smith and M.G. were not in close proximity. Rather, she stated that L.G. was the "only other eyewitness to these events aside from Mr. Smith and [M.G]."

As the discussion continued, counsel for Smith argued that L.G.'s testimony bore on M.G.'s credibility as a witness. She stated,

[M.G.] said that there were times where the child was out and that Mr. Smith was grabbing her and that she was shushing him away. [L.G.] did not see anything like that. She did not see anything of Mr. Smith attempting to kiss [M.G]. She in her interview recounted the evening, said she came out multiple times, she had the snowball fight, she came out to get snow, that her mom smiled at her and told her to come back inside. She said if I had known what was going on, I have a rifle, I would have brought out my rifle. Her recount of what happened is not consistent with [M.G.]'s recount of what happened.

The State disagreed with this characterization, pointing out that L.G. "was inside the residence for most of the time," and that there was "a lot that she couldn't actually see."

The trial court declined to give the missing witness instruction. It explained,

In the WPIC,[1] one of the requirements is it says the circumstances must establish as a matter of reasonable probability that the party

_____

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.20, at 188-89 (4th ed. 2016) (WPIC).

would not knowingly fail to call the witness in question unless the witness's testimony would be damaging. I don't find under the facts and circumstances of this case what the child observed, as well as the age of the child, that that prong is satisfied, and therefore, on that basis, I'm not giving the instruction.

The trial court's statements indicate that it did not consider L.G. to be an important witness, and that it did not view her potential testimony as material. As established above, the trial court asked counsel for Smith whether L.G. stated that she did not see Smith and M.G. in close proximity when she opened the door around the time that Smith made M.G. touch his penis. The court thought that this statement could be a material issue in relation to the allegations. However, counsel for Smith did not confirm that L.G. actually said that she did not see Smith and M.G. in close proximity. Instead, she responded that L.G. was the "only other eyewitness to these events."

Smith nonetheless argues that L.G. was in a position to observe several acts that comprised the charged crimes. He states that L.G. was close enough to the door to work the latch when "the attempted rape occurred," but that she "saw nothing." He further asserts that L.G. stuck her head out the door during one of the two instances of indecent liberties, but that, again, she "saw nothing." And, he states that L.G. "noticed nothing amiss" when M.G. got a bowl of snow for her, and that M.G. even smiled at her.

After Smith threw M.G. onto her car and tried reaching under her shirt and removing her leggings, M.G. heard the doorknob click. She clarified that the door never opened, and that L.G. never came outside. Smith does not cite evidence that L.G. could have seen what was happening through the door. Thus, based on

the record before this court, testimony by L.G. that she saw nothing during this event would be of little material value. It would not contradict M.G.'s explanation of what happened or undermine M.G.'s credibility.

Next, after Smith shoved M.G.'s hand down his pants and forced her to touch his penis, M.G. saw the door open. She clarified that L.G. then stuck her head outside. As this happened, Smith immediately stepped back from M.G., and M.G. was able to remove her hand from Smith's pants. M.G. was not sure how close she and Smith were at the time L.G. stuck her head outside. She thought that Smith might have been "stepping back." Therefore, testimony by L.G. that she saw nothing during this event would again be of little material value. It would not contradict M.G.'s explanation of what happened or undermine M.G.'s credibility.

And, M.G. did not testify that any of the acts comprising the charged crimes occurred while she got her daughter a bowl of snow. Thus, testimony by L.G. that she noticed nothing amiss at the time, and that M.G. smiled at her, would not be material. It would not contradict M.G.'s description of the events. The circumstances here do not establish that L.G.'s testimony would have been material and unfavorable to the State.

Moreover, the State had a reasonable explanation for its decision not to call L.G. to testify at trial. In L.G.'s forensic interview, she did not say anything that the State deemed to have evidentiary value. Specifically, the State explained that her forensic interview did not contain any evidence "really relevant to this case other than some information about her seeing Mr. Smith use a pocket knife to indicate that he was gutting a dog." And, given L.G.'s age, the State did not want to call a

child witness unless it was absolutely necessary to do so. Therefore, Smith failed to establish that the State would have called L.G. as a witness but for her damaging testimony. Accordingly, the trial court did not abuse its discretion in declining to give a missing witness instruction regarding L.G.

II.    Prosecutorial Misconduct

Smith argues next that the prosecutor committed incurably prejudicial misconduct at trial. He contends that this misconduct denied him his right to a fair trial on all counts.

During the rebuttal closing argument, the prosecutor made the following statement regarding L.G.'s absence as a witness:

> [Defense counsel] said, you know, we didn't hear from [M.G.'s] daughter. And I'll leave you to consider why a prosecutor wouldn't want to call a ten-year-old to testify in front of a bunch of strangers about her mother being assaulted when that's not necessary because we have a victim who went through it all.

Smith asserts that, "[i]n making this argument, the prosecutor improperly argued facts not in evidence, suggesting that L.[G.] had seen her mother being assaulted." He further asserts that this argument "improperly claimed L.[G.] would have corroborated M.G.'s testimony that Smith assaulted M.G."

Smith failed to object to this statement at trial. As a result, our review is limited to determining whether the prosecutor's alleged misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Sakellis, 164 Wn. App. 170, 184, 269 P.3d 1029 (2011). "This standard requires the defendant to establish that (1) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict,' and (2) no curative

11

instruction would have obviated the prejudicial effect on the jury." Id. (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Smith contends that, even with a curative instruction, "[t]he jury was likely to accept the State's version of the facts." He cites State v. Thierry, 190 Wn. App. 680, 694, 360 P.3d 940 (2015), for the general proposition that, because the jury normally places great confidence in the faithful execution of a prosecuting attorney's obligations, a prosecutor's improper insinuations or suggestions are apt to carry more weight against a defendant.

We agree that the State's comment could have been interpreted to suggest that L.G. witnessed the assault on her mother and the State simply did not want to put a young child through the ordeal of a sexual assault trial. But, Smith fails to explain why an admonishment to counsel and a curative instruction could not have alleviated any prejudice. In Thorgerson, the State Supreme Court determined that even ill intentioned remarks by a prosecutor in closing argument did not warrant reversal of a conviction, because the victim's testimony was consistent throughout the trial and consistent with what she had told other witnesses before the trial. 172 Wn.2d at 452.

Here, M.G.'s testimony was similarly consistent throughout the trial and consistent with what she reported to police before the trial. There was evidence to corroborate M.G.'s testimony, including the neighbor who had similar contact with Smith before he made his way to M.G.'s home, witnesses who saw her injuries that night, and physical evidence consistent with M.G.'s version of events. Given this evidence, the single, inappropriate comment in the State's rebuttal closing

argument did not have a substantial likelihood of having altered the outcome of this case.

Also, the court gave the jury the following instruction:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

We presume that the jury follows the court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

Smith has failed to establish that the alleged misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. Accordingly, his prosecutorial misconduct claim fails.

III. Ineffective Assistance of Counsel

In the alternative, Smith argues that his attorney provided ineffective assistance of counsel by not objecting to the prosecutor's remark during closing arguments.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances, and that the deficient performance prejudiced the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). If one of the two prongs of the test is absent, we need not inquire further. Strickland, 466 U.S. at 697; State v. Foster, 140 Wn. App. 266,

273, 166 P.3d 726 (2007). The reasonableness inquiry presumes effective representation and requires the defendant to show the absence of legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). Prejudice is present if there is a reasonable probability that, but for counsel's error, the result would have been different. Id. at 334-35. We review ineffective assistance of counsel claims de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

The comment was brief and there was significant evidence corroborating M.G.'s version of events. Even if we were to conclude that defense counsel's failure to object was deficient performance, Smith fails to establish that, but for counsel's failure to object, there is a reasonable probability that the result of this trial would have been any different.

Smith did not receive ineffective assistance of counsel.[2]

IV.    Legal Financial Obligations

Smith argues last that the provision in his judgment and sentence imposing interest on nonrestitution LFOs must be stricken. He relies on House Bill 1783[3] and State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018).

---

[2] Smith also argues that cumulative error deprived him of his right to a fair trial. The cumulative error doctrine applies "when a combination of trial errors denies the accused a fair trial, even when any one of the errors taken individually would be harmless." State v. Salas, 1 Wn. App. 2d 931, 952, 408 P.3d 383, review denied, 190 Wn.2d 1016, 415 P.3d 1200 (2018). Because Smith has not shown any error, the cumulative error doctrine does not apply.

[3] ENGROSSED SECOND SUBSTITUTE H.B. 1783, 65th Leg., Reg. Sess. (Wash. 2018) (House Bill 1783).

In <u>Ramirez</u>, the State Supreme Court held that House Bill 1783 applies prospectively to cases on appeal. 191 Wn.2d at 747. House Bill 1783 amends RCW 10.82.090, providing that "no interest shall accrue on nonrestitution legal financial obligations." LAWS OF 2018, ch. 269, § 1(1). The State concedes that remand is appropriate to strike the provision requiring interest accrual on nonrestitution LFOs. We accept the State's concession and remand to the trial court to strike the provision.

We affirm Smith's convictions, but remand to the trial court to strike the provision requiring interest accrual on nonrestitution LFOs.

WE CONCUR: