# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49164-8-II |
| Respondent, | |
| v. | |
| ROBERT RICHARD REED, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, P.J. — Robert Reed appeals his convictions for second degree child rape and second degree child molestation.  He argues that his attorney provided ineffective assistance of counsel for (1) failing to elicit certain testimony regarding the victim's prior abuse by a third party and (2) failing to object to the prosecutor's improper "vouching" for the victim during closing statements.  Reed also argues that (3) even if neither ineffective assistance claim succeeds, cumulative errors at trial warrant reversal.  Because all of Reed's arguments fail, we affirm.

FACTS

I. BACKGROUND

After living with his father, Reed, for two months, 12-year-old JR[1] reported that Reed was sexually abusing him. After a jury trial, Reed was convicted of second degree child rape and second degree child molestation.

II. STATE WITNESSES' TRIAL TESTIMONY

In 2003, JR's mother, Michelle Crippen, and Reed divorced. Reed had no contact with JR until 2013. During the summer of 2013, when JR was 12 years old, he expressed a desire to meet his father, and his mother arranged a meeting. JR and Reed began to meet more often and, eventually, JR began spending weekends and Wednesdays with Reed. JR at the time lived with his grandmother, Jeanette Gilson, when he was not with Reed.

In October 2013, JR went to live with Reed full time when JR's grandmother was having a difficult time managing JR's behavioral issues. JR lived with Reed in October and November 2013. During JR's visits and while JR lived with Reed, Reed touched JR's private parts in the shower and forced JR to engage in a number of sexual activities, including performing and receiving oral sex with Reed.

Over Thanksgiving weekend in 2013, JR told his grandmother about Reed's sexual abuse. JR's grandmother contacted JR's mother, and the police began to investigate the abuse allegation.

In December 2013, Kristen Mendez at the Children's Justice and Advocacy Center conducted a forensic interview of JR. The interview was observed by Detective Todd McDaniel

---

[1] We refer to the juvenile victim by his initials to protect his privacy interests. Gen. Order 2011–1 of Division II, *In re Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.).

of the Cowlitz County Sheriff's Office. Detective McDaniel investigated further and interviewed Reed. Reed was charged with second degree child rape and second degree child molestation.

At trial, JR testified regarding the details of his sexual abuse by Reed. During cross-examination, Reed's counsel asked JR about the quality of his memory. Reed's counsel asked JR about his prior hospitalization for behavior problems and asked about specific instances of JR's prior behavior issues. Reed's counsel confronted JR about whether he voluntarily, without Reed's prompting, put his face in Reed's private parts, touched Reed's butt, and exposed his penis to Reed. JR denied ever engaging voluntarily in these activities. Reed's counsel also asked JR whether he had the door open when he went to the bathroom at Reed's home, and JR denied this. In addition, Reed's attorney asked JR whether anyone told JR what to say when he testified. JR responded, "[G]randma only told me to tell the truth." 3 Report of Proceedings (RP) at 176. Reed's counsel also asked about Christmas presents that JR allegedly received after he stopped living with Reed.

Reed's attorney asked JR about one of his mother's former boyfriends named Joe, and JR stated that the former boyfriend was JR's "friend." 3 RP at 172. Reed's attorney also asked if he had been babysat by Kizzy Woodard, and JR said he had. Reed's attorney did not ask JR whether he told Woodard about prior abuse by his mother's boyfriend.

Several witnesses, including JR's mother, his former special education teacher Shawna Driscoll, and the forensic interviewer Mendez testified at trial regarding JR's behavior issues and disabilities. JR's mother testified that he suffered from autism and attention deficit hyperactivity disorder (ADHD) and that his maturity level was equivalent to that of a typical 8- or 9-year-old. JR's former special education teacher Driscoll testified that she taught JR when he was in seventh and eighth grade but that he was developmentally disabled and was reading at a first-grade level

3

and doing math at a second- or third-grade level. Driscoll stated that JR could only develop simple plans. Mendez, who had forensically interviewed JR and had experience interviewing almost a thousand children, testified that during her interview with JR, she noticed his manner of speaking and behaviors were less mature than the average 12-year-old. She stated that because JR was less mature for his age level, she interviewed him like she would interview an 8- to 10-year-old to make sure he understood. Officer McDaniel testified that during his interview of Reed, Reed stated that JR was 12 but read at a first-grade level.

### III. DEFENSE WITNESSES' TRIAL TESTIMONY

When JR lived with Reed, Reed's neighbor, Woodard, took care of JR on weekday mornings after Reed left for work. Woodard woke JR up, made him breakfast, gave him medicine, and escorted him to the school bus.

Just before Woodard was called as a witness, the prosecutor informed the court that Reed's attorney intended to have Woodard testify that JR told her that "his mom's boyfriend did bad things to him." 5 RP at 433. The court ruled that JR did not have an opportunity under ER 613 to confront the out-of-court statement for the statement to be admitted and also held that Woodard could not testify to hearsay from JR. Reed's attorney stated that he would instruct Woodard not to "say something she's not supposed to and what she cannot say." 5 RP at 439.

When Woodard testified, Reed's counsel asked whether Reed provided any information about JR to Woodard so that she would be better prepared to babysit him. Woodard responded that Reed had told her that "there are certain things that [JR] had been through and certain things to watch for. . . . He was molested by the mother's boyfriend, ex-boyfriend, or fiancé, and that he

would do things to himself, sort of watch for that." 5 RP at 452. On cross-examination, the State

engaged with the following exchange with Woodard:

[State]. The defendant told you his -- the defendant, Mr. Reed, told you
that [JR's] mom's boyfriend --
[Woodard]. [JR] also told me as well, sir.
[Defense Counsel]. Objection.
[Woodard]. I'm sorry.
[State]. You need to answer my question.
[Woodard]. Okay. Yes, sir.
[State]. Did he tell you his mom's boyfriend molested him? That's what
you testified to to the attorney.
. . . .
[Woodard]. Yes, sir.

5 RP at 457.

The court did not rule on the objection and the testimony was heard by the jury.

Reed testified that he told Woodard that he believed JR had been molested by someone and

stated that it was possibly one of JR's mother's ex-boyfriends. However, Reed *did not* testify that

JR had disclosed this abuse to him, only that "it was my opinion." 5 RP at 542. When asked

whether he had told Woodard that JR was certainly abused by one of the ex-boyfriends, Reed said

no.

Reed also testified that JR had voluntarily exhibited sexual behaviors including putting his

face in Reed's private parts, touching Reed's butt, exposing his penis to Reed, and watching Reed

shower. Reed also testified that JR's grandmother and mother were using JR to frame Reed.

IV. CLOSING ARGUMENT

During closing argument, the prosecutor stated that JR was developmentally disabled and

had autism and ADHD. The prosecutor referred to testimony regarding JR's challenges

controlling emotions when his routine was disrupted. The prosecutor argued that JR's behavior

5

difficulties did not make him "more likely to come with some master plan or some scheme to frame his father." 5 RP at 584. The prosecutor argued that this would not be expected of someone with a developmental disability:

> [E]ven though he's 12 years old at the time this happened, he's more like maybe an eight-year-old or something like that range maturity-level-wise. . . .
> . . . .
> That doesn't make him somehow more likely to concoct something like that. If anything, it makes it less likely because he doesn't have the sophisticated thought to come up with that type of plan that sort of is. So . . . a master plan . . . it's just not going to happen with him.
> And the other part is when a child is young or at a young level, they say things straight out, it's like the child who sees the person at the grocery store and says something you wish they hadn't said if you've had a young child like someone is wearing something funny or why is that person doing that.
> At his lower maturity level, it's similar. He's going to be just speaking things straight out.

5 RP at 583-84.

Reed's counsel did not object to the prosecutor's remarks during closing argument.

In Reed's closing argument, his counsel asserted, "We don't know if [Reed] did what [JR] said he did, or if somebody else did it and [JR] is taking it out on [Reed] by blaming him for things that are frustrating him that have been going on in his life for a long period of time." 5 RP at 604. Reed's counsel argued that JR's ongoing behavior issues resulted from abuse by a third party, saying, "Who was [JR] reacting to? What has happened to him in the past? Did he just start acting out when he got together with [Reed], or had he been acting out all of his entire life." 5 RP at 608. Reed specifically named JR's mother's previous boyfriends and suggests that they may be the actual source of the abuse, saying, "It could have been this fellow named Joseph, it could have been Brent [Crippen's ex-boyfriend], it could have been anybody. It's a private-type situation.

Nobody knows who did it. It sounds like somebody certainly did something." 5 RP (Apr. 15, 2016) at 613.

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

Reed argues that he received ineffective assistance of counsel when his attorney (1) failed to question JR about statements he allegedly made to his neighbor regarding prior abuse by his mother's boyfriend and (2) failed to object to the prosecutor's "improper vouching" during closing argument. Br. of Appellant at 31. We disagree because, even assuming without deciding that there was error, there is no prejudice.

A. RULES OF LAW

Ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). The federal Sixth Amendment protects defendants from ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To establish a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *State v. Carson*, 184 Wn.2d 207, 216, 357 P.3d 1064 (2015). "A failure to satisfy either prong is fatal to an ineffective assistance of counsel claim." *State v. McLean*, 178 Wn. App. 236, 246, 313 P.3d 1181 (2013) (citing *Strickland*, 466 U.S. at 687).

A defendant establishes prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011). "'A reasonable probability is a probability

7

sufficient to undermine confidence in the outcome.'" *Grier*, 171 Wn.2d at 34 (quoting *Strickland*, 466 U.S. at 694).

## B. NO PREJUDICE

Reed appears to argue that he was prejudiced by his counsel's failure to question JR about the prior abuse because he was denied the opportunity to "fully cross-examine [JR] to determine his credibility and to introduce relevant evidence that would assist the jury in determining [his] credibility." Br. of Appellant at 29. Reed says he was denied the opportunity to show that a third party was actually the source of JR's abuse, which denied him the ability to present a full defense.

However, there was no prejudice to Reed from the alleged ineffective assistance of counsel because the neighbor testified to both (1) Reed's statement to the neighbor that the victim told Reed about prior abuse by the mother's boyfriend and (2) the victim's statement to the neighbor that he had been abused by the mother's boyfriend. Reed, in his own statement of facts, states, "[JR] also told Ms. Woodard that he had been molested by one of Ms. Crippen's boyfriends," and he cites to the trial transcript of Woodard's testimony. Br. of Appellant at 9-10. Thus, Reed acknowledges that Woodard did, in fact, testify to the very matter that Reed now claims his counsel failed to elicit. So the jury heard the very testimony that Reed now claims was not admitted. While he is correct that the judge directed Reed's counsel not to ask Woodard about the statements, she offered it in testimony and the trial court admitted it.

In addition, Reed was not denied the opportunity to fully cross-examine JR. As discussed above, Reed's counsel cross-examined JR extensively. Furthermore, Reed's counsel argued at length that a third party, and not Reed, was responsible for JR's abuse. In Reed's closing argument, his counsel asserted, "We don't know if [Reed] did what [JR] said he did, or if somebody else did

it and [JR] is taking it out on [Reed] by blaming him for things that are frustrating him that have been going on in his life for a long period of time." 5 RP at 604. Reed's counsel argued that JR's ongoing behavior issues resulted from abuse by a third party: "Who was [JR] reacting to? What has happened to him in the past? Did he just start acting out when he got together with [Reed], or had he been acting out all of his entire life." 5 RP at 608. Reed even specifically named JR's mother's previous boyfriends and suggested that they may be the actual source of the abuse, saying, "It could have been this fellow named Joseph. It could have been Brent [Crippen's ex-boyfriend], it could have been anybody. It's a private-type situation. Nobody knows who did it. It sounds like somebody certainly did something." 5 RP at 613. Furthermore, Reed's counsel generally argued that JR was not credible due to his behavioral issues and disabilities. He also stated that JR could not answer open-ended questions which suggested he had been coached.

Given these statements by Reed's counsel, Reed was able to fully argue that a third party abused JR and that JR was not a credible witness. Despite hearing these arguments, the jury convicted Reed. Thus, Reed was not prejudiced because there is no reasonable probability that the result of the proceeding would have been different but for counsel's failure to question JR about his statements of prior abuse. *See Grier*, 171 Wn.2d at 34.

C. FAILURE TO OBJECT TO "IMPROPER VOUCHING"

Reed and the State agree that Reed's counsel failed to object to the prosecutor's closing argument and thus waived a claim of prosecutorial misconduct on appeal. However, Reed asserts that in failing to object to the closing argument, Reed's attorney provided ineffective assistance of counsel. We reject this argument.

1. RULES OF LAW

When a defendant bases his or her ineffective assistance of counsel claim on a trial counsel's failure to object, the defendant must show that the objection would have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

A defendant has a fundamental right to a fair trial. U.S. CONST. amends. VI, XIV; WASH. CONST. art. 1, § 22. This right may be denied if the prosecutor engages in misconduct. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a prosecutorial misconduct claim, a defendant must prove that the prosecutor's conduct was both improper and prejudicial. *Glasmann*, 175 Wn.2d at 704. Prejudice is established if there is a substantial likelihood that the misconduct affected the jury's verdict. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003); *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). In addition, if the defendant did not object to a prosecutor's conduct at trial, the defendant is deemed to have waived the error unless the misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

In closing argument, the prosecutor has "'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)). The trial court reviews the prosecutor's closing argument "in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions." *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011) (citing *Dhaliwal*, 150 Wn.2d at 578).

A prosecutor commits misconduct by personally vouching for a witness's credibility or veracity. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). "Improper vouching generally occurs (1) if the prosecutor expresses his or her *personal belief* as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (emphasis added). When a prosecutor argues only facts in evidence or suggest reasonable inferences from the evidence, there is no misconduct. *See State v. Smith*, 104 Wn.2d 497, 510-11, 707 P.2d 1306 (1985). Prejudicial error will not be found for improper vouching unless it is "'clear and unmistakable' that counsel is expressing a personal opinion." *Brett*, 126 Wn.2d at 175 (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

A prosecutor's remarks, even if they would otherwise be improper, are not misconduct if they were "'invited, provoked, or occasioned'" by defense counsel. *State v. Davenport*, 100 Wn.2d 757, 761, 675 P.2d 1213 (1984) (quoting *State v. La Porte*, 58 Wn.2d 816, 822, 365 P.2d 24 (1961)).

2. NO DEFICIENCY: FAILURE TO OBJECT TO "IMPROPER VOUCHING"

Reed argues that his counsel was deficient in failing to object to the prosecutor's closing argument. Specifically, Reed asserts that his counsel should have objected to the prosecutor's following arguments:

> "Even though he's 12 years old at the time this happened, he's more like maybe an eight-year-old or something like that range maturity-level-wise. . . . That doesn't make him somehow more likely to concoct something like that. If anything, it makes it less likely because he doesn't have the sophisticated thought to come up with that type of a plan that sort of is. So . . . a master plan . . . it's just not going to happen with him.
> And the other part is when a child is young or at a young level, they say things straight out, it's like the child who sees the person at the grocery store and says

> something you wish they hadn't said if you've had a young child like someone is
> wearing something funny or why is that person doing that.
> At his lower maturity level, it's similar. He's going to be just speaking things
> straight out."

Br. of Appellant at 32 (quoting 5 RP at 583-84).

To succeed on this ineffective assistance claim based on his attorney's failure to object to the prosecutor's alleged "vouching," Reed must show the objection would have been successful. *Gerdts*, 136 Wn. App. at 727. Reed has failed to make this showing. The State's arguments about JR's credibility were "'reasonable inferences'" based on the testimony and facts presented at trial. *Fisher*, 165 Wn.2d at 747 (quoting *Gregory*, 158 Wn.2d at 860).

At trial, several witnesses, including JR's mother, his former special education teacher Driscoll, and the forensic interviewer Mendez testified regarding JR's behavior issues and disabilities. JR's mother testified that he suffered from autism and ADHD and that his maturity level was equivalent to that of a typical eight- or nine-year-old.

JR's former special education teacher Driscoll testified that she taught JR when he was in seventh and eighth grade but that he was developmentally disabled and that he was reading at a first-grade level and doing math at a second- or third-grade level. Driscoll stated that JR could *only develop simple plans*.

Mendez, who had forensically interviewed JR and had experience interviewing almost a thousand children, testified that during her interview with JR, she noticed his manner of speaking and behaviors were less mature than the average twelve-year-old. She stated that because JR was less mature for his age level, she interviewed him like she would interview an eight- to ten-year-old to make sure he understood. Officer McDaniel testified that during his interview of Reed, Reed stated that JR was twelve but read at a first-grade level.

12

Each of these facts supports the reasonable inference suggested by the prosecutor that JR "doesn't have the sophisticated thought" to frame Reed for abuse. 5 RP at 584. Immediately before discussing that JR is "less likely" to create lies about Reed, the prosecutor referred to numerous facts from testimony regarding JR's immaturity, including JR's disabilities and developmental delay. It is evident the prosecutor relied on evidence from the record and not his personal opinions or beliefs to draw the inferences regarding JR's maturity level and propensity to scheme and lie about Reed's abuse.

In addition, the prosecution's closing statements were not improper because they were "'invited, provoked, or occasioned'" by defense counsel. Br. of Resp't at 29 (quoting *Davenport*, 100 Wn.2d at 761). Reed testified that JR was participating in a scheme with his mother and grandmother to lie about Reed's abuse. Thus, the State, in making its remarks about JR's reduced maturity and developmental delays, was properly responding to the defense argument that JR was capable of participating in a scheme to frame Reed. *See Davenport*, 100 Wn.2d at 761.

Because the prosecutor argued only facts in evidence and suggested reasonable inferences from the evidence and because the State's arguments were in response to the defense claim that JR fabricated the abuse allegations in a scheme with his mother and grandmother, there was no misconduct. *See Smith*, 104 Wn.2d at 510-11; *Davenport*, 100 Wn.2d at 761.

3.      NO PREJUDICE: FAILURE TO OBJECT TO "IMPROPER VOUCHING"

Reed argues that the prosecutor's closing argument was prejudicial because JR was the most important State witness, and "[JR's] credibility was the main issue the jury had to determine." Br. of Appellant at 34. However, Reed fails to explain how the prosecutor's closing statements impacted the ultimate outcome of the trial. And prejudicial error will not be found for improper

13

vouching unless it is "'clear and unmistakable' that counsel is expressing a personal opinion." *Brett*, 126 Wn.2d at 175 (quoting *Sargent*, 40 Wn. App. at 344). Even if the prosecutor's statements were improper, there is no evidence that the prosecutor expressed a *personal opinion* about JR's credibility. Instead, he relied on inferences from the trial record. Thus, there is no prejudice. *Brett*, 126 Wn.2d at 175.

## II. CUMULATIVE ERROR

Reed also argues that, even if there is no ineffective assistance of counsel, the "combined effect of trial errors" should result in reversal. Br. of Appellant at 35. We reject this argument.

"The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless. The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014) (citations omitted). The petitioner bears the burden of showing multiple trial errors and that the accumulated prejudice impacted the trial outcome. *Cross*, 180 Wn.2d at 690.

In an effort to establish cumulative error, Reed points to his counsel's failure to question JR about his prior statements about being abused and his counsel's failure to object to the State's alleged "vouching" for JR's credibility. As discussed above, we hold that Reed has failed to establish any prejudicial error. At most, we assume without deciding that a single error occurred; but even so, Reed has not established multiple prejudicial errors as is required to prove cumulative error. *See Cross*, 180 Wn.2d at 690. Because Reed has not met his burden to show multiple trial errors resulting in prejudice, his cumulative error claim fails.

No. 49164-8-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

LEE, J.

MELNICK, J.